RECEIVED
CLERK, U.S. DISTRICT COURT

JUN - 3 2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT

JUN - 4 2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ___RS___ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

**2:20-CV-04973-UA**

FILED
CLERK, U.S. DISTRICT COURT

JUL - 8 2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ___RS___ DEPUTY

1

2    Saltwater Networks LLC

3        Plaintiff,

4            vs.

5    Small Business Administration
     Bank Of America

6        PayPal

7

8        Defendants

9

10

**COMPLAINT**

**(UNFAIR LENDING**

**PRACTICES )**

**Violation of the Civil RICO Act**

**DEMAND FOR BENCH TRIAL**

2:20-CV-04973-ODW-AFMx

11    Plaintiff Lauren Boden a woman, Herby   Complains   against   The Small Business

12  Administration, Bank Of America, PayPal and hereby ask the Court that her (Payroll Paucheck

13  Program(PPP) Loan  applied  be granted and relief. That at all times particular to the SBA and Bank

14  Of America lending practices women were unduly discriminated against and her Small Business

15  which is owned 100% by her in particular was hurt and treated unfairly under State and Federal Law

16  by granting of 85% of all PPL loans to men and business that did not qualify as Small Business.

17  PayPal violated Federal Statutes by using personal credit score for the PPL loans qualification when

     congress specifically prohibited such actions.

18                              **THE PARTIES**

19  1.    Ms. Boden is a woman who owns a small business in Los Angeles California and US
            citizen.

20
21  2.    The Small Business Association is ran by Ms. Jovita Carranza, Administrator
            is a US based Organization and is mandated to observe State and Federal Laws.

22  3.    Bank Of America is a lending institution who does Business in all 50 States including

23  California and was approved to  disburse money through the Cares Act Paycheck Protection

24  Program and is governed by State and Federal Laws passed by congress the SBA has a duty

25  to follow the Guidelines set by Congress and cannot override Congress neither can Bank of

26  America or PayPal

Plaintiff ( Boden)Alleges

## **JURISDICTION AND VENUE**

5.      This Court has jurisdiction over this matter as there is complete diversity of citizenship between the parties pursuant to 28 U.S.C. § 1332 and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.      This Court has personal jurisdiction over  (Boden) Saltwater Films & Networks   Plaintiff who resides , pay taxes and is domiciled in the great State Of California  in  Los Angeles .The economic loss occurred in California,

7.      This Court also has jurisdiction over  Bank Of America , PayPal and The  Small Business Administration

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as a substantial part of the events and/or omissions giving rise to this claim occurred in this district.

## ALLEGATIONS

9.      Plaintiff (Ms. Boden)is a mother of 3 babies under 5 and is the owner and operator of Saltwater Films and Networks who operates on Amazon Prime Television Show Beverly Hills Social, USA  Dance TV on Comcast.

In January of 2019 the company began operation on  new release with 46 employees.

10.     In late February Plaintiff became ill with COVID-19 and was sick for 36 days or all of March 2020.

All employees on production were told they would be paid through the cares act once the loans were approved.

11.     Bank Of America initially advised Plaintiff on their website should could not apply using their services in March whilst plaintiff was ill because they were only approving business with prior lending relationships, even though her Business account was with Bank of America.

12.     In April Bank Of America changed their status so Plaintiff could use their services.

13.     Plaintiff listed her PPP loan for approximately 1.4 Million dollars leaving out several employees who had not been paid for work assuring them Saltwater Films & Networks would divide whatever loans provided so all 56 would have some portion.

14.     No loans were ever issued to Plaintiff and Saltwater Films from the (PPP) loans.\

15.     Plaintiff was discriminated against by PayPal when it used her personal credit score to determine her PPP loan Eligibility- Plaintiff is seeking a Business Loan not a Personal Loan - Plaintiff ask the court to see **Exhibit 1** PPP guidelines and **Exhibit 2**  H.R.748 — 116th Congress (2019-2020)

16.     Plaintiff states to the court that she was discriminated against when Bank of America decided not to process her loan in the first round because she did not have an existing Loan with Bank Of America . H.R. 748 does not state that in any part of the ACT of congress.

17.     Plaintiff states she was discriminated against when the SBA did not enforce fairly and equitably Women receive an equal share of the PPP loan in comparison to men.

18. Plaintiff states she was discriminated against by the SBA because  Businesses in Iowa, Nebraska and North Dakota were among the biggest beneficiaries of the PPL loan.

19. None of these States or Business were affected by COVID-19 and none of the owners were afflicted with COVID-19  when accounting for the number of people working for small businesses in each state.

20.All three states were below the national median for cases of the virus per capita, and none imposed statewide lockdowns as the outbreak began to spread nationwide during the First round of loans which they received and none of the business in said States were closed.

21.H.R. 748 Specifically states (Sec. 1103) This section authorizes the SBA to award grants to resource partners to provide specified education, training, and advising to small business concerns that are negatively impacted as a result of COVID-19.

22. Plaintiff specifically states to the court none of these requirements were met by the SBA in issuing these loans and as such Plaintiff who was legitimately affected and negatively impacted by COVID-19 as specifically stated in (Sec.1103) but yet received no aid.

23 The SBA did say they were changing the guidelines for round two, Plaintiff again puts before the Court that by changing the guidelines by which the first round of men 85%  recievied loans , so Plaintiff who is a woman would be under stricter guidelines is unfair and  bias .

25. For purposes of factual statement to the court with supporting evidence. ECONOMIC STABILIZATION This division establishes the Paycheck Protection Program to provide eight weeks of cash flow assistance to small businesses through federally guaranteed loans to employers who maintain their payroll.

26. Such assistance shall be to cover costs such as payroll, paid sick leave, supply chain disruptions, and employee salaries. The division further provides that certain amounts owed on such loans are eligible to be forgiven.

27. The division also authorizes the Small Business Administration (SBA) to provide advances on SBA emergency disaster loans for small businesses that have **applied for such loans due to the COVID-19 pandemic.**

28. Additionally, the division requires the SBA to pay all principal, interest, and fees on certain new and existing SBA loans for a period of six months.

29. TITLE I--KEEPING AMERICAN WORKERS PAID AND EMPLOYED ACT **This title provides emergency economic relief for small businesses to meet their payroll and expenses and to receive education and assistance throughout the COVID-19 pandemic.**

30. (Sec. 1102) This section authorizes the Small Business Administration (SBA) to guarantee paycheck protection loans during the period beginning on February 15, 2020, and ending on June 30, 2020.

31. During this period, in addition to a small business, any business, nonprofit organization, veterans organization, or tribal business is eligible to receive a paycheck protection loan if it employs fewer than 500 employees or the applicable SBA size standard for the relevant industry.

32. In addition, individuals who operate as sole proprietors or as independent contractors, as well as certain self-employed individuals, are eligible to receive a paycheck protection loan. Allowable uses for such loans include (1) payroll costs, (2) continuation of group health care benefits, (3) employee salaries, and (4) rent payments.

33.Federal law requires my loan be granted , the Equal Credit Opportunity Act (ECOA) , offers protections against discrimination. Title VII of the Civil right act of 1964 also guarantees Bank Of America and the SBA not discriminate against me in business practices.

34.PayPal violated Federal Law The ECOA forbids credit discrimination on the basis of race, color, religion, national origin, sex, marital status, age. These laws also forbids discrimination based on race, color, religion, sex and or gender.
PayPal and Bank Of America violated H.R. 748 clearly states  The SBA shall waive (1) any rules related to the personal guarantee on advances and loans under a certain amount, (2) the requirement that an applicant must be in business for the one-year period prior to the disaster (except that no waiver may be made for a business not in operation on January 31, 2020), and (3) the requirement that an applicant be unable to obtain credit elsewhere.

35.Several of these business are not only credit worthy they have and can obtain credit elsewhere Saltwater films and Networks is not and can't this was our life line during this crisis.

36.(Sec. 1111) This section requires the SBA to provide its resources and services in the 10 most commonly spoken languages, other than English, in the United States and to guarantee uniformity and clear guidelines for all lending institutions.

37.(Sec. 1112) This section requires the SBA to pay the principal, interest, and any associated fees that are owed on certain SBA loans for a six-month period. Such loans must be in a regular servicing status.

38.(Sec. 1113) This section expands bankruptcy relief by (1) excluding from current monthly income any payments made under federal law relating to the national emergency declared by the President with respect to COVID-19, and (2) allowing the modification of a reorganization plan under Chapter 11 if the debtor is experiencing material financial hardship due to COVID-19.
39.That Congress   establishes the Paycheck Protection Program to provide eight weeks of cash flow assistance to small businesses through federally guaranteed loans to employers who maintain their payroll.
40.Such assistance shall be to cover costs such as payroll, paid sick leave, supply chain disruptions, and employee salaries. The division further provides that certain amounts owed on such loans are eligible to be forgiven. T**he division also authorizes the Small Business Administration (SBA) to provide advances on SBA emergency disaster loans for small businesses that have applied for such loans due to the COVID-19 pandemic.**

**First Claim for Relief**
**(Discrimination based on Gender -**
**All Defendants)**

42. The SBA issued 85 % of the PPP loans in the first round to men.

43. Bank of America and PayPal denied my application to be a first round applicant as a woman but over 80% of men were accepted they failed to conform to a standard lending Practice to participate in the Payroll Paycheck Program this is Federal Tax Payers Funds and the banks receive 1-3 % for their services as issuers they pay not discriminate or implement their own policy but can only adhere to Federal mandated guidelines issued by congress both Parties failed and engaged in Federal Criminal negligence.

44. The SBA has issued new guidelines for round two of the loans where more minorities and women were awarded , me were treated differently in the first round than women. The SBA has to maintain complete authority over all lending institutions when Federal Funds are used. The very idea of being complicit in wire fraud and the Rico Act needs to be remedied by the court.

45. I have not yet received my PPP loan for the employees   who have already done work and continues to work on USA dance TV and the new movie release Miami Nights - Revenge of Slash

46. I note to the court 75% of my workforce are women in Film congress never intended and there is no language in H.R 748 that says the loans should function  as a cash infusion for less affected firms and not provide support the hardest-hit firms.

47.

49 All three states are below the national median for cases of the virus per capita, and none imposed statewide lockdowns as the outbreak began to spread nationwide, the SBA didn't just single me out , they willfully left my business to fail  because I am a female.
48. As a survivor of COVID-19 who was sick with my minor children for 41 days I find it hard to understand why my company was not 1st in line and why I'm still awaiting my PPP loan, it was the sole purpose the Paycheck Payroll Program was established- Business affected by COVID-19 not business who friends of BIG BANKS
50. Businesses in Iowa, Kentucky , Nebraska and North Dakota were among the biggest beneficiaries of the early aid when accounting for the number of people working for small businesses in each state. Where applicant's were 87% Men.

Exh-1   H.R 748   - 33 pages
Exh-2   -  Guidlines for Men - 4 pages
Exh-3  - Guidlines for Women + minorites 39 pages
Exh- 4 - Denial  By Bank of America -1pg
Exh -5  -  Denianil  By PayPal - 2 pgs

## Second -Third and FourthClaim For
## Relief
### Fraud , Violation Of The Rico
### Act,Negligence

To Plaintiff from receiving her PPP Loan

51. Plaintiff incorporates each of the foregoing paragraphs as fully stated within and hereby claims her company was denied a loan because of fraudulent and deceptive lending practices by Bank Of America- PayPal , SBA in violation of the RICO ACT

52. Plaintiff contends and hereby claims her company was denied a loan because of fraudulent and deceptive practices by Bank Of America, PayPal and the SBA The civil RICO section says, "any person injured in his business or property by reason of a violation of section 1962 may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee. By implementing their own guidelines ,willfully disobeying an act of congress the parties engaged in conduct to profiteering for clients based on association and not by COVID-19 related guidelines.

53. Plaintiff contends the SBA and Bank of America were directed by Congress under

54. H.R. 748 was suppose to provide forgivable loans program to subsidize small businesses so that they continue paying employee salaries and other bills while their revenues were reduced by  COVID-19.

55. H.R.748 Employers that were  Eligible for Assistance were  All businesses and nonprofit organizations with fewer than 500 employees were eligible for financial assistance under the program. Sole-proprietors and self-employed people were also eligible for relief, Public traded companies were no eligible.

55. After depriving my small business of the ability to get a loan in the First round Bank Of America and the SBA  loaned money to the  Fiesta Restaurant Group (FRGI), parent company of Taco Cabana, who got $10 million, RAVE Restaurant Group (RAVE), Pizza Inn and Pie Five, which got $657,000 each totaling 30 Million each hotel chain Braemar (BHR), got $15.8 million, Red Lions (RLH), got $4.23 million; Pharmaceutical companies Publicly Traded like Xeris (XERS), got $5 million, Adamis (ADMP), which got $3.12 million, and Cumberland (CPIX), got $2.19 million.

56. The public company that got the most PPP loan money was Ashford Hospitality Trust, a Dallas-based real estate investment firm that owns 117 hotels and has already received $30 million by applying on behalf of 42 different subsidiaries, and expects to receive more loan money. Ashford Inc., a related company, received $12.8 million.
57. Mr. Monty Bennett,  chairman of Ashford Hospitality Trust, Ashford Inc., and Braemar Hotels,  collectively received $58.6 million in PPP loans.

58. The Bank Of America and PayPal ,SBA prioritized aid for well-connected companies over small businesses, millions of dollars were streamlined to big restaurant and luxury hotel chains defrauding small business like mine the opportunity to stay afloat.

-8-

**WHEREFORE, Plaintiff requests judgment against Defendants,** jointly and severally, and in favor of Saltwater Films & Networks .

 That Plaintiff receive 3 times her loan request from each defendant totaling 5 Million each Defendant , That the SBA , Bank Of America and PayPal issue loans and treats women and minorities fairly and equitably  no differently than it does white men.

That PayPal and Bank Of America  lending institutions treat all minorities and women business fairly and equitably no differently than it does men

A. For general damages in an amount no less than 10 Million .

B. For special damages in an amount no less than 10 Million .

C.     For  Plaintiff's costs incurred herein

D.     For interest on Plaintiff's damages and costs;

E.     For Economic  loss;

F.     For all other relief available under law and equity.

That The Small Business Administration and Bank Of America preserve all correspondence between 1. The SBA and the treasury in connection with the PPP loans  2. That Bank Of America preserve all correspondence between Bank Of America and The SBA. 3. That the SBA preserve all communications between itself and any governing body that influenced it's decisions.

Until such time my loan is dispersed or the matter goes to trial.

Demand For Bench  Trial Before

Plaintiff  hereby demands a trial  pursuant to Rule 38, Federal Rules of Civil Procedure, and L.R. 38-1.  And agrees to any hearings and trial by Video Conferencing

RESPECTFULLY SUBMITTED this 13th day of May, 2020

Lauren Boden on Behalf of Saltwater Films & Networks

*[signature]*  May 13, 2020

1357 South Orange Dr
Los Angeles CA 90019
Tel: 310-802-9777
Fax: 310-802-9777
Email: PR@saltwaternetworks.com
Prose Plaintiff

DEFENDANTS

PayPal
2211 N 1st St, San Jose, CA 95131

Bank of America Corporate Center, 100 North Tryon Street, Charlotte, NC 28255.

U.S. Small Business Administration 409 3rd St, SW. Washington DC 20416

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

**Saltwater Films & Networks**

NOTICE OF INTENT TO PROCEED
BEFORE UNITED STATES
DISTRICT JUDGE

Plaintiff(s),

v.

CASE NUMBER:

**United States Small Business
Administration**

/Bank Of America  Bank Of America
        Defendant(s).

### NOTICE OF INTENT TO PROCEED BEFORE DISTRICT JUDGE

In accordance with the provisions of 28 U.S.C. 636(b), (c) and FRCP 73, the parties in this case hereby request that a United States District Judge be assigned to this case.

Signatures                                    Date

_____                    _____

5/13/2020

H. R. 748



# One Hundred Sixteenth Congress
## of the
## United States of America

### AT THE SECOND SESSION

*Begun and held at the City of Washington on Friday,*
*the third day of January, two thousand and twenty*

## An Act

To amend the Internal Revenue Code of 1986 to repeal the excise tax on high
cost employer-sponsored health coverage.

*Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Coronavirus Aid, Relief, and
Economic Security Act" or the "CARES Act".

**SEC. 2. TABLE OF CONTENTS.**

The table of contents for this Act is as follows:

Sec. 1. Short title.
Sec. 2. Table of contents.
Sec. 3. References.

DIVISION A—KEEPING WORKERS PAID AND EMPLOYED, HEALTH CARE
SYSTEM ENHANCEMENTS, AND ECONOMIC STABILIZATION

TITLE I—KEEPING AMERICAN WORKERS PAID AND EMPLOYED ACT

Sec. 1101. Definitions.
Sec. 1102. Paycheck protection program.
Sec. 1103. Entrepreneurial development.
Sec. 1104. State trade expansion program.
Sec. 1105. Waiver of matching funds requirement under the women's business cen-
ter program.
Sec. 1106. Loan forgiveness.
Sec. 1107. Direct appropriations.
Sec. 1108. Minority business development agency.
Sec. 1109. United States Treasury Program Management Authority.
Sec. 1110. Emergency EIDL grants.
Sec. 1111. Resources and services in languages other than English.
Sec. 1112. Subsidy for certain loan payments.
Sec. 1113. Bankruptcy.
Sec. 1114. Emergency rulemaking authority.

TITLE II—ASSISTANCE FOR AMERICAN WORKERS, FAMILIES, AND
BUSINESSES

Subtitle A—Unemployment Insurance Provisions

Sec. 2101. Short title.
Sec. 2102. Pandemic Unemployment Assistance.
Sec. 2103. Emergency unemployment relief for governmental entities and nonprofit
organizations.
Sec. 2104. Emergency increase in unemployment compensation benefits.
Sec. 2105. Temporary full Federal funding of the first week of compensable regular
unemployment for States with no waiting week.
Sec. 2106. Emergency State staffing flexibility.
Sec. 2107. Pandemic emergency unemployment compensation.
Sec. 2108. Temporary financing of short-time compensation payments in States
with programs in law.
Sec. 2109. Temporary financing of short-time compensation agreements.

H. R. 748—2

Sec. 2110. Grants for short-time compensation programs.
Sec. 2111. Assistance and guidance in implementing programs.
Sec. 2112. Waiver of the 7-day waiting period for benefits under the Railroad Unemployment Insurance Act.
Sec. 2113. Enhanced benefits under the Railroad Unemployment Insurance Act.
Sec. 2114. Extended unemployment benefits under the Railroad Unemployment Insurance Act.
Sec. 2115. Funding for the DOL Office of Inspector General for oversight of unemployment provisions.
Sec. 2116. Implementation.

Subtitle B—Rebates and Other Individual Provisions

Sec. 2201. 2020 recovery rebates for individuals.
Sec. 2202. Special rules for use of retirement funds.
Sec. 2203. Temporary waiver of required minimum distribution rules for certain retirement plans and accounts.
Sec. 2204. Allowance of partial above the line deduction for charitable contributions.
Sec. 2205. Modification of limitations on charitable contributions during 2020.
Sec. 2206. Exclusion for certain employer payments of student loans.

Subtitle C—Business Provisions

Sec. 2301. Employee retention credit for employers subject to closure due to COVID–19.
Sec. 2302. Delay of payment of employer payroll taxes.
Sec. 2303. Modifications for net operating losses.
Sec. 2304. Modification of limitation on losses for taxpayers other than corporations.
Sec. 2305. Modification of credit for prior year minimum tax liability of corporations.
Sec. 2306. Modifications of limitation on business interest.
Sec. 2307. Technical amendments regarding qualified improvement property.
Sec. 2308. Temporary exception from excise tax for alcohol used to produce hand sanitizer.

TITLE III—SUPPORTING AMERICA'S HEALTH CARE SYSTEM IN THE FIGHT AGAINST THE CORONAVIRUS

Subtitle A—Health Provisions

Sec. 3001. Short title.

PART I—ADDRESSING SUPPLY SHORTAGES

SUBPART A—MEDICAL PRODUCT SUPPLIES

Sec. 3101. National Academies report on America's medical product supply chain security.
Sec. 3102. Requiring the strategic national stockpile to include certain types of medical supplies.
Sec. 3103. Treatment of respiratory protective devices as covered countermeasures.

SUBPART B—MITIGATING EMERGENCY DRUG SHORTAGES

Sec. 3111. Prioritize reviews of drug applications; incentives.
Sec. 3112. Additional manufacturer reporting requirements in response to drug shortages.

SUBPART C—PREVENTING MEDICAL DEVICE SHORTAGES

Sec. 3121. Discontinuance or interruption in the production of medical devices.

PART II—ACCESS TO HEALTH CARE FOR COVID–19 PATIENTS

SUBPART A—COVERAGE OF TESTING AND PREVENTIVE SERVICES

Sec. 3201. Coverage of diagnostic testing for COVID–19.
Sec. 3202. Pricing of diagnostic testing.
Sec. 3203. Rapid coverage of preventive services and vaccines for coronavirus.

SUBPART B—SUPPORT FOR HEALTH CARE PROVIDERS

Sec. 3211. Supplemental awards for health centers.
Sec. 3212. Telehealth network and telehealth resource centers grant programs.
Sec. 3213. Rural health care services outreach, rural health network development, and small health care provider quality improvement grant programs.

Sec. 3214. United States Public Health Service Modernization.
Sec. 3215. Limitation on liability for volunteer health care professionals during COVID–19 emergency response.
Sec. 3216. Flexibility for members of National Health Service Corps during emergency period.

SUBPART C—MISCELLANEOUS PROVISIONS

Sec. 3221. Confidentiality and disclosure of records relating to substance use disorder.
Sec. 3222. Nutrition services.
Sec. 3223. Continuity of service and opportunities for participants in community service activities under title V of the Older Americans Act of 1965.
Sec. 3224. Guidance on protected health information.
Sec. 3225. Reauthorization of healthy start program.
Sec. 3226. Importance of the blood supply.

PART III—INNOVATION

Sec. 3301. Removing the cap on OTA during public health emergencies.
Sec. 3302. Priority zoonotic animal drugs.

PART IV—HEALTH CARE WORKFORCE

Sec. 3401. Reauthorization of health professions workforce programs.
Sec. 3402. Health workforce coordination.
Sec. 3403. Education and training relating to geriatrics.
Sec. 3404. Nursing workforce development.

Subtitle B—Education Provisions

Sec. 3501. Short title.
Sec. 3502. Definitions.
Sec. 3503. Campus-based aid waivers.
Sec. 3504. Use of supplemental educational opportunity grants for emergency aid.
Sec. 3505. Federal work-study during a qualifying emergency.
Sec. 3506. Adjustment of subsidized loan usage limits.
Sec. 3507. Exclusion from Federal Pell Grant duration limit.
Sec. 3508. Institutional refunds and Federal student loan flexibility.
Sec. 3509. Satisfactory academic progress.
Sec. 3510. Continuing education at affected foreign institutions.
Sec. 3511. National emergency educational waivers.
Sec. 3512. HBCU Capital financing.
Sec. 3513. Temporary relief for federal student loan borrowers.
Sec. 3514. Provisions related to the Corporation for National and Community Service.
Sec. 3515. Workforce response activities.
Sec. 3516. Technical amendments.
Sec. 3517. Waiver authority and reporting requirement for institutional aid.
Sec. 3518. Authorized uses and other modifications for grants.
Sec. 3519. Service obligations for teachers.

Subtitle C—Labor Provisions

Sec. 3601. Limitation on paid leave.
Sec. 3602. Emergency Paid Sick Leave Act Limitation.
Sec. 3603. Unemployment insurance.
Sec. 3604. OMB Waiver of Paid Family and Paid Sick Leave.
Sec. 3605. Paid leave for rehired employees.
Sec. 3606. Advance refunding of credits.
Sec. 3607. Expansion of DOL Authority to postpone certain deadlines.
Sec. 3608. Single-employer plan funding rules.
Sec. 3609. Application of cooperative and small employer charity pension plan rules to certain charitable employers whose primary exempt purpose is providing services with respect to mothers and children.
Sec. 3610. Federal contractor authority.
Sec. 3611. Technical corrections.

Subtitle D—Finance Committee

Sec. 3701. Exemption for telehealth services.
Sec. 3702. Inclusion of certain over-the-counter medical products as qualified medical expenses.
Sec. 3703. Increasing Medicare telehealth flexibilities during emergency period.
Sec. 3704. Enhancing Medicare telehealth services for Federally qualified health centers and rural health clinics during emergency period.

H. R. 748—4

Sec. 3705. Temporary waiver of requirement for face-to-face visits between home dialysis patients and physicians.
Sec. 3706. Use of telehealth to conduct face-to-face encounter prior to recertification of eligibility for hospice care during emergency period.
Sec. 3707. Encouraging use of telecommunications systems for home health services furnished during emergency period.
Sec. 3708. Improving care planning for Medicare home health services.
Sec. 3709. Adjustment of sequestration.
Sec. 3710. Medicare hospital inpatient prospective payment system add-on payment for COVID–19 patients during emergency period.
Sec. 3711. Increasing access to post-acute care during emergency period.
Sec. 3712. Revising payment rates for durable medical equipment under the Medicare program through duration of emergency period.
Sec. 3713. Coverage of the COVID–19 vaccine under part B of the Medicare program without any cost-sharing.
Sec. 3714. Requiring Medicare prescription drug plans and MA–PD plans to allow during the COVID–19 emergency period for fills and refills of covered part D drugs for up to a 3-month supply.
Sec. 3715. Providing home and community-based services in acute care hospitals.
Sec. 3716. Clarification regarding uninsured individuals.
Sec. 3717. Clarification regarding coverage of COVID–19 testing products.
Sec. 3718. Amendments relating to reporting requirements with respect to clinical diagnostic laboratory tests.
Sec. 3719. Expansion of the Medicare hospital accelerated payment program during the COVID–19 public health emergency.
Sec. 3720. Delaying requirements for enhanced FMAP to enable State legislation necessary for compliance.

Subtitle E—Health and Human Services Extenders

PART I—MEDICARE PROVISIONS

Sec. 3801. Extension of the work geographic index floor under the Medicare program.
Sec. 3802. Extension of funding for quality measure endorsement, input, and selection.
Sec. 3803. Extension of funding outreach and assistance for low-income programs.

PART II—MEDICAID PROVISIONS

Sec. 3811. Extension of the Money Follows the Person rebalancing demonstration program.
Sec. 3812. Extension of spousal impoverishment protections.
Sec. 3813. Delay of DSH reductions.
Sec. 3814. Extension and expansion of Community Mental Health Services demonstration program.

PART III—HUMAN SERVICES AND OTHER HEALTH PROGRAMS

Sec. 3821. Extension of sexual risk avoidance education program.
Sec. 3822. Extension of personal responsibility education program.
Sec. 3823. Extension of demonstration projects to address health professions workforce needs.
Sec. 3824. Extension of the temporary assistance for needy families program and related programs.

PART IV—PUBLIC HEALTH PROVISIONS

Sec. 3831. Extension for community health centers, the National Health Service Corps, and teaching health centers that operate GME programs.
Sec. 3832. Diabetes programs.

PART V—MISCELLANEOUS PROVISIONS

Sec. 3841. Prevention of duplicate appropriations for fiscal year 2020.

Subtitle F—Over-the-Counter Drugs

PART I—OTC DRUG REVIEW

Sec. 3851. Regulation of certain nonprescription drugs that are marketed without an approved drug application.
Sec. 3852. Misbranding.
Sec. 3853. Drugs excluded from the over-the-counter drug review.
Sec. 3854. Treatment of Sunscreen Innovation Act.
Sec. 3855. Annual update to Congress on appropriate pediatric indication for certain OTC cough and cold drugs.

H. R. 748—5

Sec. 3856. Technical corrections.

PART II—USER FEES

Sec. 3861. Finding.
Sec. 3862. Fees relating to over-the-counter drugs.

TITLE IV—ECONOMIC STABILIZATION AND ASSISTANCE TO SEVERELY
DISTRESSED SECTORS OF THE UNITED STATES ECONOMY

Subtitle A—Coronavirus Economic Stabilization Act of 2020

Sec. 4001. Short title.
Sec. 4002. Definitions.
Sec. 4003. Emergency relief and taxpayer protections.
Sec. 4004. Limitation on certain employee compensation.
Sec. 4005. Continuation of certain air service.
Sec. 4006. Coordination with Secretary of Transportation.
Sec. 4007. Suspension of certain aviation excise taxes.
Sec. 4008. Debt guarantee authority.
Sec. 4009. Temporary Government in the Sunshine Act relief.
Sec. 4010. Temporary hiring flexibility.
Sec. 4011. Temporary lending limit waiver.
Sec. 4012. Temporary relief for community banks.
Sec. 4013. Temporary relief from troubled debt restructurings.
Sec. 4014. Optional temporary relief from current expected credit losses.
Sec. 4015. Non-applicability of restrictions on ESF during national emergency.
Sec. 4016. Temporary credit union provisions.
Sec. 4017. Increasing access to materials necessary for national security and pandemic recovery.
Sec. 4018. Special Inspector General for Pandemic Recovery.
Sec. 4019. Conflicts of interest.
Sec. 4020. Congressional Oversight Commission.
Sec. 4021. Credit protection during COVID–19.
Sec. 4022. Foreclosure moratorium and consumer right to request forbearance.
Sec. 4023. Forbearance of residential mortgage loan payments for multifamily properties with federally backed loans.
Sec. 4024. Temporary moratorium on eviction filings.
Sec. 4025. Protection of collective bargaining agreement.
Sec. 4026. Reports.
Sec. 4027. Direct appropriation.
Sec. 4028. Rule of construction.
Sec. 4029. Termination of authority.

Subtitle B—Air Carrier Worker Support

Sec. 4111. Definitions.
Sec. 4112. Pandemic relief for aviation workers.
Sec. 4113. Procedures for providing payroll support.
Sec. 4114. Required assurances.
Sec. 4115. Protection of collective bargaining agreement.
Sec. 4116. Limitation on certain employee compensation.
Sec. 4117. Tax payer protection.
Sec. 4118. Reports.
Sec. 4119. Coordination.
Sec. 4120. Direct appropriation.

TITLE V—CORONAVIRUS RELIEF FUNDS

Sec. 5001. Coronavirus Relief Fund.

TITLE VI—MISCELLANEOUS PROVISIONS

Sec. 6001. COVID–19 borrowing authority for the United States Postal Service.
Sec. 6002. Emergency designation.

DIVISION B—EMERGENCY APPROPRIATIONS FOR CORONAVIRUS HEALTH
RESPONSE AND AGENCY OPERATIONS

**SEC. 3. REFERENCES.**

Except as expressly provided otherwise, any reference to "this Act" contained in any division of this Act shall be treated as referring only to the provisions of that division.

# DIVISION A—KEEPING WORKERS PAID AND EMPLOYED, HEALTH CARE SYSTEM ENHANCEMENTS, AND ECONOMIC STABILIZATION

## TITLE I—KEEPING AMERICAN WORKERS PAID AND EMPLOYED ACT

**SEC. 1101. DEFINITIONS.**

In this title—

(1) the terms "Administration" and "Administrator" mean the Small Business Administration and the Administrator thereof, respectively; and

(2) the term "small business concern" has the meaning given the term in section 3 of the Small Business Act (15 U.S.C. 636).

**SEC. 1102. PAYCHECK PROTECTION PROGRAM.**

(a) IN GENERAL.—Section 7(a) of the Small Business Act (15 U.S.C. 636(a)) is amended—

(1) in paragraph (2)—

(A) in subparagraph (A), in the matter preceding clause (i), by striking "and (E)" and inserting "(E), and (F)"; and

(B) by adding at the end the following:

"(F) PARTICIPATION IN THE PAYCHECK PROTECTION PROGRAM.—In an agreement to participate in a loan on a deferred basis under paragraph (36), the participation by the Administration shall be 100 percent."; and

(2) by adding at the end the following:

"(36) PAYCHECK PROTECTION PROGRAM.—

"(A) DEFINITIONS.—In this paragraph—

"(i) the terms 'appropriate Federal banking agency' and 'insured depository institution' have the meanings given those terms in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813);

"(ii) the term 'covered loan' means a loan made under this paragraph during the covered period;

"(iii) the term 'covered period' means the period beginning on February 15, 2020 and ending on June 30, 2020;

"(iv) the term 'eligible recipient' means an individual or entity that is eligible to receive a covered loan;

"(v) the term 'eligible self-employed individual' has the meaning given the term in section 7002(b) of the Families First Coronavirus Response Act (Public Law 116–127);

"(vi) the term 'insured credit union' has the meaning given the term in section 101 of the Federal Credit Union Act (12 U.S.C. 1752);

"(vii) the term 'nonprofit organization' means an organization that is described in section 501(c)(3) of the Internal Revenue Code of 1986 and that is exempt from taxation under section 501(a) of such Code;

H. R. 748—7

"(viii) the term 'payroll costs'—
   "(I) means—
      "(aa) the sum of payments of any compensation with respect to employees that is a—
         "(AA) salary, wage, commission, or similar compensation;
         "(BB) payment of cash tip or equivalent;
         "(CC) payment for vacation, parental, family, medical, or sick leave;
         "(DD) allowance for dismissal or separation;
         "(EE) payment required for the provisions of group health care benefits, including insurance premiums;
         "(FF) payment of any retirement benefit; or
         "(GG) payment of State or local tax assessed on the compensation of employees; and
      "(bb) the sum of payments of any compensation to or income of a sole proprietor or independent contractor that is a wage, commission, income, net earnings from self-employment, or similar compensation and that is in an amount that is not more than $100,000 in 1 year, as prorated for the covered period; and
   "(II) shall not include—
      "(aa) the compensation of an individual employee in excess of an annual salary of $100,000, as prorated for the covered period;
      "(bb) taxes imposed or withheld under chapters 21, 22, or 24 of the Internal Revenue Code of 1986 during the covered period;
      "(cc) any compensation of an employee whose principal place of residence is outside of the United States;
      "(dd) qualified sick leave wages for which a credit is allowed under section 7001 of the Families First Coronavirus Response Act (Public Law 116–127); or
      "(ee) qualified family leave wages for which a credit is allowed under section 7003 of the Families First Coronavirus Response Act (Public Law 116–127); and
   "(ix) the term 'veterans organization' means an organization that is described in section 501(c)(19) of the Internal Revenue Code that is exempt from taxation under section 501(a) of such Code.
   "(B) PAYCHECK PROTECTION LOANS.—Except as otherwise provided in this paragraph, the Administrator may guarantee covered loans under the same terms, conditions, and processes as a loan made under this subsection.

H. R. 748—8

"(C) REGISTRATION OF LOANS.—Not later than 15 days after the date on which a loan is made under this paragraph, the Administration shall register the loan using the TIN (as defined in section 7701 of the Internal Revenue Code of 1986) assigned to the borrower.

"(D) INCREASED ELIGIBILITY FOR CERTAIN SMALL BUSINESSES AND ORGANIZATIONS.—

"(i) IN GENERAL.—During the covered period, in addition to small business concerns, any business concern, nonprofit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) shall be eligible to receive a covered loan if the business concern, nonprofit organization, veterans organization, or Tribal business concern employs not more than the greater of—

"(I) 500 employees; or

"(II) if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, nonprofit organization, veterans organization, or Tribal business concern operates.

"(ii) INCLUSION OF SOLE PROPRIETORS, INDEPENDENT CONTRACTORS, AND ELIGIBLE SELF-EMPLOYED INDIVIDUALS.—

"(I) IN GENERAL.—During the covered period, individuals who operate under a sole proprietorship or as an independent contractor and eligible self-employed individuals shall be eligible to receive a covered loan.

"(II) DOCUMENTATION.—An eligible self-employed individual, independent contractor, or sole proprietorship seeking a covered loan shall submit such documentation as is necessary to establish such individual as eligible, including payroll tax filings reported to the Internal Revenue Service, Forms 1099–MISC, and income and expenses from the sole proprietorship, as determined by the Administrator and the Secretary.

"(iii) BUSINESS CONCERNS WITH MORE THAN 1 PHYSICAL LOCATION.—During the covered period, any business concern that employs not more than 500 employees per physical location of the business concern and that is assigned a North American Industry Classification System code beginning with 72 at the time of disbursal shall be eligible to receive a covered loan.

"(iv) WAIVER OF AFFILIATION RULES.—During the covered period, the provisions applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations, or any successor regulation, are waived with respect to eligibility for a covered loan for—

"(I) any business concern with not more than 500 employees that, as of the date on which the covered loan is disbursed, is assigned a North American Industry Classification System code beginning with 72;

H. R. 748—9

"(II) any business concern operating as a franchise that is assigned a franchise identifier code by the Administration; and

"(III) any business concern that receives financial assistance from a company licensed under section 301 of the Small Business Investment Act of 1958 (15 U.S.C. 681).

"(v) EMPLOYEE.—For purposes of determining whether a business concern, nonprofit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) employs not more than 500 employees under clause (i)(I), the term 'employee' includes individuals employed on a full-time, part-time, or other basis.

"(vi) AFFILIATION.—The provisions applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations, or any successor thereto, shall apply with respect to a nonprofit organization and a veterans organization in the same manner as with respect to a small business concern.

"(E) MAXIMUM LOAN AMOUNT.—During the covered period, with respect to a covered loan, the maximum loan amount shall be the lesser of—

"(i)(I) the sum of—

"(aa) the product obtained by multiplying—

"(AA) the average total monthly payments by the applicant for payroll costs incurred during the 1-year period before the date on which the loan is made, except that, in the case of an applicant that is seasonal employer, as determined by the Administrator, the average total monthly payments for payroll shall be for the 12-week period beginning February 15, 2019, or at the election of the eligible recipient, March 1, 2019, and ending June 30, 2019; by

"(BB) 2.5; and

"(bb) the outstanding amount of a loan under subsection (b)(2) that was made during the period beginning on January 31, 2020 and ending on the date on which covered loans are made available to be refinanced under the covered loan; or

"(II) if requested by an otherwise eligible recipient that was not in business during the period beginning on February 15, 2019 and ending on June 30, 2019, the sum of—

"(aa) the product obtained by multiplying—

"(AA) the average total monthly payments by the applicant for payroll costs incurred during the period beginning on January 1, 2020 and ending on February 29, 2020; by

"(BB) 2.5; and

"(bb) the outstanding amount of a loan under subsection (b)(2) that was made during the period beginning on January 31, 2020 and ending on the date on which covered loans are made available to be refinanced under the covered loan; or

"(ii) $10,000,000.

"(F) ALLOWABLE USES OF COVERED LOANS.—

"(i) IN GENERAL.—During the covered period, an eligible recipient may, in addition to the allowable uses of a loan made under this subsection, use the proceeds of the covered loan for—

"(I) payroll costs;

"(II) costs related to the continuation of group health care benefits during periods of paid sick, medical, or family leave, and insurance premiums;

"(III) employee salaries, commissions, or similar compensations;

"(IV) payments of interest on any mortgage obligation (which shall not include any prepayment of or payment of principal on a mortgage obligation);

"(V) rent (including rent under a lease agreement);

"(VI) utilities; and

"(VII) interest on any other debt obligations that were incurred before the covered period.

"(ii) DELEGATED AUTHORITY.—

"(I) IN GENERAL.—For purposes of making covered loans for the purposes described in clause (i), a lender approved to make loans under this subsection shall be deemed to have been delegated authority by the Administrator to make and approve covered loans, subject to the provisions of this paragraph.

"(II) CONSIDERATIONS.—In evaluating the eligibility of a borrower for a covered loan with the terms described in this paragraph, a lender shall consider whether the borrower—

"(aa) was in operation on February 15, 2020; and

"(bb)(AA) had employees for whom the borrower paid salaries and payroll taxes; or

"(BB) paid independent contractors, as reported on a Form 1099–MISC.

"(iii) ADDITIONAL LENDERS.—The authority to make loans under this paragraph shall be extended to additional lenders determined by the Administrator and the Secretary of the Treasury to have the necessary qualifications to process, close, disburse and service loans made with the guarantee of the Administration.

"(iv) REFINANCE.—A loan made under subsection (b)(2) during the period beginning on January 31, 2020 and ending on the date on which covered loans are made available may be refinanced as part of a covered loan.

"(v) NONRECOURSE.—Notwithstanding the waiver of the personal guarantee requirement or collateral under subparagraph (J), the Administrator shall have no recourse against any individual shareholder, member, or partner of an eligible recipient of a covered loan for nonpayment of any covered loan, except to

the extent that such shareholder, member, or partner uses the covered loan proceeds for a purpose not authorized under clause (i).

"(G) BORROWER REQUIREMENTS.—

"(i) CERTIFICATION.—An eligible recipient applying for a covered loan shall make a good faith certification—

"(I) that the uncertainty of current economic conditions makes necessary the loan request to support the ongoing operations of the eligible recipient;

"(II) acknowledging that funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments;

"(III) that the eligible recipient does not have an application pending for a loan under this subsection for the same purpose and duplicative of amounts applied for or received under a covered loan; and

"(IV) during the period beginning on February 15, 2020 and ending on December 31, 2020, that the eligible recipient has not received amounts under this subsection for the same purpose and duplicative of amounts applied for or received under a covered loan.

"(H) FEE WAIVER.—During the covered period, with respect to a covered loan—

"(i) in lieu of the fee otherwise applicable under paragraph (23)(A), the Administrator shall collect no fee; and

"(ii) in lieu of the fee otherwise applicable under paragraph (18)(A), the Administrator shall collect no fee.

"(I) CREDIT ELSEWHERE.—During the covered period, the requirement that a small business concern is unable to obtain credit elsewhere, as defined in section 3(h), shall not apply to a covered loan.

"(J) WAIVER OF PERSONAL GUARANTEE REQUIREMENT.— During the covered period, with respect to a covered loan—

"(i) no personal guarantee shall be required for the covered loan; and

"(ii) no collateral shall be required for the covered loan.

"(K) MATURITY FOR LOANS WITH REMAINING BALANCE AFTER APPLICATION OF FORGIVENESS.—With respect to a covered loan that has a remaining balance after reduction based on the loan forgiveness amount under section 1106 of the CARES Act—

"(i) the remaining balance shall continue to be guaranteed by the Administration under this subsection; and

"(ii) the covered loan shall have a maximum maturity of 10 years from the date on which the borrower applies for loan forgiveness under that section.

"(L) INTEREST RATE REQUIREMENTS.—A covered loan shall bear an interest rate not to exceed 4 percent.

H. R. 748—12

"(M) LOAN DEFERMENT.—

"(i) DEFINITION OF IMPACTED BORROWER.—

"(I) IN GENERAL.—In this subparagraph, the term 'impacted borrower' means an eligible recipient that—

"(aa) is in operation on February 15, 2020; and

"(bb) has an application for a covered loan that is approved or pending approval on or after the date of enactment of this paragraph.

"(II) PRESUMPTION.—For purposes of this subparagraph, an impacted borrower is presumed to have been adversely impacted by COVID–19.

"(ii) DEFERRAL.—During the covered period, the Administrator shall—

"(I) consider each eligible recipient that applies for a covered loan to be an impacted borrower; and

"(II) require lenders under this subsection to provide complete payment deferment relief for impacted borrowers with covered loans for a period of not less than 6 months, including payment of principal, interest, and fees, and not more than 1 year.

"(iii) SECONDARY MARKET.—During the covered period, with respect to a covered loan that is sold on the secondary market, if an investor declines to approve a deferral requested by a lender under clause (ii), the Administrator shall exercise the authority to purchase the loan so that the impacted borrower may receive a deferral for a period of not less than 6 months, including payment of principal, interest, and fees, and not more than 1 year.

"(iv) GUIDANCE.—Not later than 30 days after the date of enactment of this paragraph, the Administrator shall provide guidance to lenders under this paragraph on the deferment process described in this subparagraph.

"(N) SECONDARY MARKET SALES.—A covered loan shall be eligible to be sold in the secondary market consistent with this subsection. The Administrator may not collect any fee for any guarantee sold into the secondary market under this subparagraph.

"(O) REGULATORY CAPITAL REQUIREMENTS.—

"(i) RISK WEIGHT.—With respect to the appropriate Federal banking agencies or the National Credit Union Administration Board applying capital requirements under their respective risk-based capital requirements, a covered loan shall receive a risk weight of zero percent.

"(ii) TEMPORARY RELIEF FROM TDR DISCLOSURES.—Notwithstanding any other provision of law, an insured depository institution or an insured credit union that modifies a covered loan in relation to COVID–19-related difficulties in a troubled debt restructuring on or after March 13, 2020, shall not be required to comply with the Financial Accounting Standards Board

H. R. 748—13

Accounting Standards Codification Subtopic 310–40 ('Receivables – Troubled Debt Restructurings by Creditors') for purposes of compliance with the requirements of the Federal Deposit Insurance Act (12 U.S.C. 1811 et seq.), until such time and under such circumstances as the appropriate Federal banking agency or the National Credit Union Administration Board, as applicable, determines appropriate.

"(P) REIMBURSEMENT FOR PROCESSING.—

"(i) IN GENERAL.—The Administrator shall reimburse a lender authorized to make a covered loan at a rate, based on the balance of the financing outstanding at the time of disbursement of the covered loan, of—

"(I) 5 percent for loans of not more than $350,000;

"(II) 3 percent for loans of more than $350,000 and less than $2,000,000; and

"(III) 1 percent for loans of not less than $2,000,000.

"(ii) FEE LIMITS.—An agent that assists an eligible recipient to prepare an application for a covered loan may not collect a fee in excess of the limits established by the Administrator.

"(iii) TIMING.—A reimbursement described in clause (i) shall be made not later than 5 days after the disbursement of the covered loan.

"(iv) SENSE OF THE SENATE.—It is the sense of the Senate that the Administrator should issue guidance to lenders and agents to ensure that the processing and disbursement of covered loans prioritizes small business concerns and entities in underserved and rural markets, including veterans and members of the military community, small business concerns owned and controlled by socially and economically disadvantaged individuals (as defined in section 8(d)(3)(C)), women, and businesses in operation for less than 2 years.

"(Q) DUPLICATION.—Nothing in this paragraph shall prohibit a recipient of an economic injury disaster loan made under subsection (b)(2) during the period beginning on January 31, 2020 and ending on the date on which covered loans are made available that is for a purpose other than paying payroll costs and other obligations described in subparagraph (F) from receiving assistance under this paragraph.

"(R) WAIVER OF PREPAYMENT PENALTY.—Notwithstanding any other provision of law, there shall be no prepayment penalty for any payment made on a covered loan.".

(b) COMMITMENTS FOR 7(A) LOANS.—During the period beginning on February 15, 2020 and ending on June 30, 2020—

(1) the amount authorized for commitments for general business loans authorized under section 7(a) of the Small Business Act (15 U.S.C. 636(a)), including loans made under paragraph (36) of such section, as added by subsection (a), shall be $349,000,000,000; and

H. R. 748—14

(2) the amount authorized for commitments for such loans under the heading "BUSINESS LOANS PROGRAM ACCOUNT" under the heading "SMALL BUSINESS ADMINISTRATION" under title V of the Consolidated Appropriations Act, 2020 (Public Law 116–93; 133 Stat. 2475) shall not apply.

(c) EXPRESS LOANS.—

(1) IN GENERAL.—Section 7(a)(31)(D) of the Small Business Act (15 U.S.C. 636(a)(31)(D)) is amended by striking "$350,000" and inserting "$1,000,000".

(2) PROSPECTIVE REPEAL.—Effective on January 1, 2021, section 7(a)(31)(D) of the Small Business Act (15 U.S.C. 636(a)(31)(D)) is amended by striking "$1,000,000" and inserting "$350,000".

(d) EXCEPTION TO GUARANTEE FEE WAIVER FOR VETERANS.— Section 7(a)(31)(G) of the Small Business Act (15 U.S.C. 636(a)(31)(G)) is amended—

(1) by striking clause (ii); and

(2) by redesignating clause (iii) as clause (ii).

(e) INTERIM RULE.—On and after the date of enactment of this Act, the interim final rule published by the Administrator entitled "Express Loan Programs: Affiliation Standards" (85 Fed. Reg. 7622 (February 10, 2020)) is permanently rescinded and shall have no force or effect.

**SEC. 1103. ENTREPRENEURIAL DEVELOPMENT.**

(a) DEFINITIONS.—In this section—

(1) the term "covered small business concern" means a small business concern that has experienced, as a result of COVID–19—

(A) supply chain disruptions, including changes in—

(i) quantity and lead time, including the number of shipments of components and delays in shipments;

(ii) quality, including shortages in supply for quality control reasons; and

(iii) technology, including a compromised payment network;

(B) staffing challenges;

(C) a decrease in gross receipts or customers; or

(D) a closure;

(2) the term "resource partner" means—

(A) a small business development center; and

(B) a women's business center;

(3) the term "small business development center" has the meaning given the term in section 3 of the Small Business Act (15 U.S.C. 632); and

(4) the term "women's business center" means a women's business center described in section 29 of the Small Business Act (15 U.S.C. 656).

(b) EDUCATION, TRAINING, AND ADVISING GRANTS.—

(1) IN GENERAL.—The Administration may provide financial assistance in the form of grants to resource partners to provide education, training, and advising to covered small business concerns.

(2) USE OF FUNDS.—Grants under this subsection shall be used for the education, training, and advising of covered small business concerns and their employees on—

H. R. 748—15

(A) accessing and applying for resources provided by the Administration and other Federal resources relating to access to capital and business resiliency;

(B) the hazards and prevention of the transmission and communication of COVID–19 and other communicable diseases;

(C) the potential effects of COVID–19 on the supply chains, distribution, and sale of products of covered small business concerns and the mitigation of those effects;

(D) the management and practice of telework to reduce possible transmission of COVID–19;

(E) the management and practice of remote customer service by electronic or other means;

(F) the risks of and mitigation of cyber threats in remote customer service or telework practices;

(G) the mitigation of the effects of reduced travel or outside activities on covered small business concerns during COVID–19 or similar occurrences; and

(H) any other relevant business practices necessary to mitigate the economic effects of COVID–19 or similar occurrences.

(3) GRANT DETERMINATION.—

(A) SMALL BUSINESS DEVELOPMENT CENTERS.—The Administration shall award 80 percent of funds authorized to carry out this subsection to small business development centers, which shall be awarded pursuant to a formula jointly developed, negotiated, and agreed upon, with full participation of both parties, between the association formed under section 21(a)(3)(A) of the Small Business Act (15 U.S.C. 648(a)(3)(A)) and the Administration.

(B) WOMEN'S BUSINESS CENTERS.—The Administration shall award 20 percent of funds authorized to carry out this subsection to women's business centers, which shall be awarded pursuant to a process established by the Administration in consultation with recipients of assistance.

(C) NO MATCHING FUNDS REQUIRED.—Matching funds shall not be required for any grant under this subsection.

(4) GOALS AND METRICS.—

(A) IN GENERAL.—Goals and metrics for the funds made available under this subsection shall be jointly developed, negotiated, and agreed upon, with full participation of both parties, between the resource partners and the Administrator, which shall—

(i) take into consideration the extent of the circumstances relating to the spread of COVID–19, or similar occurrences, that affect covered small business concerns located in the areas covered by the resource partner, particularly in rural areas or economically distressed areas;

(ii) generally follow the use of funds outlined in paragraph (2), but shall not restrict the activities of resource partners in responding to unique situations; and

(iii) encourage resource partners to develop and provide services to covered small business concerns.

H. R. 748—16

(B) PUBLIC AVAILABILITY.—The Administrator shall make publicly available the methodology by which the Administrator and resource partners jointly develop the metrics and goals described in subparagraph (A).

(c) RESOURCE PARTNER ASSOCIATION GRANTS.—

(1) IN GENERAL.—The Administrator may provide grants to an association or associations representing resource partners under which the association or associations shall establish a single centralized hub for COVID–19 information, which shall include—

(A) 1 online platform that consolidates resources and information available across multiple Federal agencies for small business concerns related to COVID–19; and

(B) a training program to educate resource partner counselors, members of the Service Corps of Retired Executives established under section 8(b)(1)(B) of the Small Business Act (15 U.S.C. 637(b)(1)(B)), and counselors at veterans business outreach centers described in section 32 of the Small Business Act (15 U.S.C. 657b) on the resources and information described in subparagraph (A).

(2) GOALS AND METRICS.—Goals and metrics for the funds made available under this subsection shall be jointly developed, negotiated, and agreed upon, with full participation of both parties, between the association or associations receiving a grant under this subsection and the Administrator.

(d) REPORT.—Not later than 6 months after the date of enactment of this Act, and annually thereafter, the Administrator shall submit to the Committee on Small Business and Entrepreneurship of the Senate and the Committee on Small Business of the House of Representatives a report that describes—

(1) with respect to the initial year covered by the report—

(A) the programs and services developed and provided by the Administration and resource partners under subsection (b);

(B) the initial efforts to provide those services under subsection (b); and

(C) the online platform and training developed and provided by the Administration and the association or associations under subsection (c); and

(2) with respect to the subsequent years covered by the report—

(A) with respect to the grant program under subsection (b)—

(i) the efforts of the Administrator and resource partners to develop services to assist covered small business concerns;

(ii) the challenges faced by owners of covered small business concerns in accessing services provided by the Administration and resource partners;

(iii) the number of unique covered small business concerns that were served by the Administration and resource partners; and

(iv) other relevant outcome performance data with respect to covered small business concerns, including the number of employees affected, the effect on sales, the disruptions of supply chains, and the efforts made

H. R. 748—17

by the Administration and resource partners to mitigate these effects; and
(B) with respect to the grant program under subsection (c)—
(i) the efforts of the Administrator and the association or associations to develop and evolve an online resource for small business concerns; and
(ii) the efforts of the Administrator and the association or associations to develop a training program for resource partner counselors, including the number of counselors trained.

### SEC. 1104. STATE TRADE EXPANSION PROGRAM.

(a) IN GENERAL.—Notwithstanding paragraph (3)(C)(iii) of section 22(l) of the Small Business Act (15 U.S.C. 649(l)), for grants under the State Trade Expansion Program under such section 22(l) using amounts made available for fiscal year 2018 or fiscal year 2019, the period of the grant shall continue through the end of fiscal year 2021.

(b) REIMBURSEMENT.—The Administrator shall reimburse any recipient of assistance under section 22(l) of the Small Business Act (15 U.S.C. 649(l)) for financial losses relating to a foreign trade mission or a trade show exhibition that was cancelled solely due to a public health emergency declared due to COVID–19 if the reimbursement does not exceed a recipient's grant funding.

### SEC. 1105. WAIVER OF MATCHING FUNDS REQUIREMENT UNDER THE WOMEN'S BUSINESS CENTER PROGRAM.

During the 3-month period beginning on the date of enactment of this Act, the requirement relating to obtaining cash contributions from non-Federal sources under section 29(c)(1) of the Small Business Act (15 U.S.C. 656(c)(1)) is waived for any recipient of assistance under such section 29.

### SEC. 1106. LOAN FORGIVENESS.

(a) DEFINITIONS.—In this section—
(1) the term "covered loan" means a loan guaranteed under paragraph (36) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), as added by section 1102;
(2) the term "covered mortgage obligation" means any indebtedness or debt instrument incurred in the ordinary course of business that—
(A) is a liability of the borrower;
(B) is a mortgage on real or personal property; and
(C) was incurred before February 15, 2020;
(3) the term "covered period" means the 8-week period beginning on the date of the origination of a covered loan;
(4) the term "covered rent obligation" means rent obligated under a leasing agreement in force before February 15, 2020;
(5) the term "covered utility payment" means payment for a service for the distribution of electricity, gas, water, transportation, telephone, or internet access for which service began before February 15, 2020;
(6) the term "eligible recipient" means the recipient of a covered loan;
(7) the term "expected forgiveness amount" means the amount of principal that a lender reasonably expects a borrower to expend during the covered period on the sum of any—

H. R. 748—18

(A) payroll costs;

(B) payments of interest on any covered mortgage obligation (which shall not include any prepayment of or payment of principal on a covered mortgage obligation);

(C) payments on any covered rent obligation; and

(D) covered utility payments; and

(8) the term "payroll costs" has the meaning given that term in paragraph (36) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), as added by section 1102 of this Act.

(b) FORGIVENESS.—An eligible recipient shall be eligible for forgiveness of indebtedness on a covered loan in an amount equal to the sum of the following costs incurred and payments made during the covered period:

(1) Payroll costs.

(2) Any payment of interest on any covered mortgage obligation (which shall not include any prepayment of or payment of principal on a covered mortgage obligation).

(3) Any payment on any covered rent obligation.

(4) Any covered utility payment.

(c) TREATMENT OF AMOUNTS FORGIVEN.—

(1) IN GENERAL.—Amounts which have been forgiven under this section shall be considered canceled indebtedness by a lender authorized under section 7(a) of the Small Business Act (15 U.S.C. 636(a)).

(2) PURCHASE OF GUARANTEES.—For purposes of the purchase of the guarantee for a covered loan by the Administrator, amounts which are forgiven under this section shall be treated in accordance with the procedures that are otherwise applicable to a loan guaranteed under section 7(a) of the Small Business Act (15 U.S.C. 636(a)).

(3) REMITTANCE.—Not later than 90 days after the date on which the amount of forgiveness under this section is determined, the Administrator shall remit to the lender an amount equal to the amount of forgiveness, plus any interest accrued through the date of payment.

(4) ADVANCE PURCHASE OF COVERED LOAN.—

(A) REPORT.—A lender authorized under section 7(a) of the Small Business Act (15 U.S.C. 636(a)), or, at the discretion of the Administrator, a third party participant in the secondary market, may, report to the Administrator an expected forgiveness amount on a covered loan or on a pool of covered loans of up to 100 percent of the principal on the covered loan or pool of covered loans, respectively.

(B) PURCHASE.—The Administrator shall purchase the expected forgiveness amount described in subparagraph (A) as if the amount were the principal amount of a loan guaranteed under section 7(a) of the Small Business Act 636(a)).

(C) TIMING.—Not later than 15 days after the date on which the Administrator receives a report under subparagraph (A), the Administrator shall purchase the expected forgiveness amount under subparagraph (B) with respect to each covered loan to which the report relates.

(d) LIMITS ON AMOUNT OF FORGIVENESS.—

H. R. 748—19

(1) AMOUNT MAY NOT EXCEED PRINCIPAL.—The amount of loan forgiveness under this section shall not exceed the principal amount of the financing made available under the applicable covered loan.

(2) REDUCTION BASED ON REDUCTION IN NUMBER OF EMPLOYEES.—

(A) IN GENERAL.—The amount of loan forgiveness under this section shall be reduced, but not increased, by multiplying the amount described in subsection (b) by the quotient obtained by dividing—

(i) the average number of full-time equivalent employees per month employed by the eligible recipient during the covered period; by

(ii)(I) at the election of the borrower—

(aa) the average number of full-time equivalent employees per month employed by the eligible recipient during the period beginning on February 15, 2019 and ending on June 30, 2019; or

(bb) the average number of full-time equivalent employees per month employed by the eligible recipient during the period beginning on January 1, 2020 and ending on February 29, 2020; or

(II) in the case of an eligible recipient that is seasonal employer, as determined by the Administrator, the average number of full-time equivalent employees per month employed by the eligible recipient during the period beginning on February 15, 2019 and ending on June 30, 2019.

(B) CALCULATION OF AVERAGE NUMBER OF EMPLOYEES.—For purposes of subparagraph (A), the average number of full-time equivalent employees shall be determined by calculating the average number of full-time equivalent employees for each pay period falling within a month.

(3) REDUCTION RELATING TO SALARY AND WAGES.—

(A) IN GENERAL.—The amount of loan forgiveness under this section shall be reduced by the amount of any reduction in total salary or wages of any employee described in subparagraph (B) during the covered period that is in excess of 25 percent of the total salary or wages of the employee during the most recent full quarter during which the employee was employed before the covered period.

(B) EMPLOYEES DESCRIBED.—An employee described in this subparagraph is any employee who did not receive, during any single pay period during 2019, wages or salary at an annualized rate of pay in an amount more than $100,000.

(4) TIPPED WORKERS.—An eligible recipient with tipped employees described in section 3(m)(2)(A) of the Fair Labor Standards Act of 1938 (29 U.S.C. 203(m)(2)(A)) may receive forgiveness for additional wages paid to those employees.

(5) EXEMPTION FOR RE-HIRES.—

(A) IN GENERAL.—In a circumstance described in subparagraph (B), the amount of loan forgiveness under this section shall be determined without regard to a reduction in the number of full-time equivalent employees of an eligible recipient or a reduction in the salary of 1 or

H. R. 748—20

more employees of the eligible recipient, as applicable, during the period beginning on February 15, 2020 and ending on the date that is 30 days after the date of enactment of this Act.

(B) CIRCUMSTANCES.—A circumstance described in this subparagraph is a circumstance—

(i) in which—

(I) during the period beginning on February 15, 2020 and ending on the date that is 30 days after the date of enactment of this Act, there is a reduction, as compared to February 15, 2020, in the number of full-time equivalent employees of an eligible recipient; and

(II) not later than June 30, 2020, the eligible employer has eliminated the reduction in the number of full-time equivalent employees;

(ii) in which—

(I) during the period beginning on February 15, 2020 and ending on the date that is 30 days after the date of enactment of this Act, there is a reduction, as compared to February 15, 2020, in the salary or wages of 1 or more employees of the eligible recipient; and

(II) not later than June 30, 2020, the eligible employer has eliminated the reduction in the salary or wages of such employees; or

(iii) in which the events described in clause (i) and (ii) occur.

(6) EXEMPTIONS.—The Administrator and the Secretary of the Treasury may prescribe regulations granting de minimis exemptions from the requirements under this subsection.

(e) APPLICATION.—An eligible recipient seeking loan forgiveness under this section shall submit to the lender that is servicing the covered loan an application, which shall include—

(1) documentation verifying the number of full-time equivalent employees on payroll and pay rates for the periods described in subsection (d), including—

(A) payroll tax filings reported to the Internal Revenue Service; and

(B) State income, payroll, and unemployment insurance filings;

(2) documentation, including cancelled checks, payment receipts, transcripts of accounts, or other documents verifying payments on covered mortgage obligations, payments on covered lease obligations, and covered utility payments;

(3) a certification from a representative of the eligible recipient authorized to make such certifications that—

(A) the documentation presented is true and correct; and

(B) the amount for which forgiveness is requested was used to retain employees, make interest payments on a covered mortgage obligation, make payments on a covered rent obligation, or make covered utility payments; and

(4) any other documentation the Administrator determines necessary.

(f) PROHIBITION ON FORGIVENESS WITHOUT DOCUMENTATION.—No eligible recipient shall receive forgiveness under this section

H. R. 748—21

without submitting to the lender that is servicing the covered
loan the documentation required under subsection (e).

(g) DECISION.—Not later than 60 days after the date on which
a lender receives an application for loan forgiveness under this
section from an eligible recipient, the lender shall issue a decision
on the an application.

(h) HOLD HARMLESS.—If a lender has received the documenta-
tion required under this section from an eligible recipient attesting
that the eligible recipient has accurately verified the payments
for payroll costs, payments on covered mortgage obligations, pay-
ments on covered lease obligations, or covered utility payments
during covered period—

(1) an enforcement action may not be taken against the
lender under section 47(e) of the Small Business Act (15 U.S.C.
657t(e)) relating to loan forgiveness for the payments for payroll
costs, payments on covered mortgage obligations, payments
on covered lease obligations, or covered utility payments, as
the case may be; and

(2) the lender shall not be subject to any penalties by
the Administrator relating to loan forgiveness for the payments
for payroll costs, payments on covered mortgage obligations,
payments on covered lease obligations, or covered utility pay-
ments, as the case may be.

(i) TAXABILITY.—For purposes of the Internal Revenue Code
of 1986, any amount which (but for this subsection) would be
includible in gross income of the eligible recipient by reason of
forgiveness described in subsection (b) shall be excluded from gross
income.

(j) RULE OF CONSTRUCTION.—The cancellation of indebtedness
on a covered loan under this section shall not otherwise modify
the terms and conditions of the covered loan.

(k) REGULATIONS.—Not later than 30 days after the date of
enactment of this Act, the Administrator shall issue guidance and
regulations implementing this section.

**SEC. 1107. DIRECT APPROPRIATIONS.**

(a) IN GENERAL.—There is appropriated, out of amounts in
the Treasury not otherwise appropriated, for the fiscal year ending
September 30, 2020, to remain available until September 30, 2021,
for additional amounts—

(1) $349,000,000,000 under the heading "Small Business
Administration—Business Loans Program Account, CARES
Act" for the cost of guaranteed loans as authorized under para-
graph (36) of section 7(a) of the Small Business Act (15 U.S.C.
636(a)), as added by section 1102(a) of this Act;

(2) $675,000,000 under the heading "Small Business
Administration—Salaries and Expenses" for salaries and
expenses of the Administration;

(3) $25,000,000 under the heading "Small Business
Administration—Office of Inspector General", to remain avail-
able until September 30, 2024, for necessary expenses of the
Office of Inspector General of the Administration in carrying
out the provisions of the Inspector General Act of 1978 (5
U.S.C. App.);

(4) $265,000,000 under the heading "Small Business
Administration—Entrepreneurial Development Programs", of
which—

H. R. 748—22

    (A) $240,000,000 shall be for carrying out section 1103(b) of this Act; and

    (B) $25,000,000 shall be for carrying out section 1103(c) of this Act;

  (5) $10,000,000 under the heading "Department of Commerce—Minority Business Development Agency" for minority business centers of the Minority Business Development Agency to provide technical assistance to small business concerns;

  (6) $10,000,000,000 under the heading "Small Business Administration—Emergency EIDL Grants" shall be for carrying out section 1110 of this Act;

  (7) $17,000,000,000 under the heading "Small Business Administration—Business Loans Program Account, CARES Act" shall be for carrying out section 1112 of this Act; and

  (8) $25,000,000 under the heading "Department of the Treasury—Departmental Offices—Salaries and Expenses" shall be for carrying out section 1109 of this Act.

  (b) SECONDARY MARKET.—During the period beginning on the date of enactment of this Act and ending on September 30, 2021, guarantees of trust certificates authorized by section 5(g) of the Small Business Act (15 U.S.C. 635(g)) shall not exceed a principal amount of $100,000,000,000.

  (c) REPORTS.—Not later than 180 days after the date of enactment of this Act, the Administrator shall submit to the Committee on Appropriations of the Senate and the Committee on Appropriations of the House of Representatives a detailed expenditure plan for using the amounts appropriated to the Administration under subsection (a).

## SEC. 1108. MINORITY BUSINESS DEVELOPMENT AGENCY.

  (a) DEFINITIONS.—In this section—

  (1) the term "Agency" means the Minority Business Development Agency of the Department of Commerce;

  (2) the term "minority business center" means a Business Center of the Agency;

  (3) the term "minority business enterprise" means a for-profit business enterprise—

    (A) not less than 51 percent of which is owned by 1 or more socially disadvantaged individuals, as determined by the Agency; and

    (B) the management and daily business operations of which are controlled by 1 or more socially disadvantaged individuals, as determined by the Agency; and

  (4) the term "minority chamber of commerce" means a chamber of commerce developed specifically to support minority business enterprises.

  (b) EDUCATION, TRAINING, AND ADVISING GRANTS.—

  (1) IN GENERAL.—The Agency may provide financial assistance in the form of grants to minority business centers and minority chambers of commerce to provide education, training, and advising to minority business enterprises.

  (2) USE OF FUNDS.—Grants under this section shall be used for the education, training, and advising of minority business enterprises and their employees on—

    (A) accessing and applying for resources provided by the Agency and other Federal resources relating to access to capital and business resiliency;

H. R. 748—23

(B) the hazards and prevention of the transmission and communication of COVID–19 and other communicable diseases;

(C) the potential effects of COVID–19 on the supply chains, distribution, and sale of products of minority business enterprises and the mitigation of those effects;

(D) the management and practice of telework to reduce possible transmission of COVID–19;

(E) the management and practice of remote customer service by electronic or other means;

(F) the risks of and mitigation of cyber threats in remote customer service or telework practices;

(G) the mitigation of the effects of reduced travel or outside activities on minority business enterprises during COVID–19 or similar occurrences; and

(H) any other relevant business practices necessary to mitigate the economic effects of COVID–19 or similar occurrences.

(3) No MATCHING FUNDS REQUIRED.—Matching funds shall not be required for any grant under this section.

(4) GOALS AND METRICS.—

(A) IN GENERAL.—Goals and metrics for the funds made available under this section shall be jointly developed, negotiated, and agreed upon, with full participation of both parties, between the minority business centers, minority chambers of commerce, and the Agency, which shall—

(i) take into consideration the extent of the circumstances relating to the spread of COVID–19, or similar occurrences, that affect minority business enterprises located in the areas covered by minority business centers and minority chambers of commerce, particularly in rural areas or economically distressed areas;

(ii) generally follow the use of funds outlined in paragraph (2), but shall not restrict the activities of minority business centers and minority chambers of commerce in responding to unique situations; and

(iii) encourage minority business centers and minority chambers of commerce to develop and provide services to minority business enterprises.

(B) PUBLIC AVAILABILITY.—The Agency shall make publicly available the methodology by which the Agency, minority business centers, and minority chambers of commerce jointly develop the metrics and goals described in subparagraph (A).

(c) WAIVERS.—

(1) IN GENERAL.—Notwithstanding any other provision of law or regulation, the Agency may, during the 3-month period that begins on the date of enactment of this Act, waive any matching requirement imposed on a minority business center or a specialty center of the Agency under a cooperative agreement between such a center and the Agency if the applicable center is unable to raise funds, or has suffered a loss of revenue, because of the effects of COVID–19.

(2) REMAINING COMPLIANT.—Notwithstanding any provision of a cooperative agreement between the Agency and a minority business center, if, during the period beginning on the date

H. R. 748—24

of enactment of this Act and ending on September 30, 2021, such a center decides not to collect fees because of the economic consequences of COVID–19, the center shall be considered to be in compliance with that agreement if—

(A) the center notifies the Agency with respect to that decision, which the center may provide through electronic mail; and

(B) the Agency, not later than 15 days after the date on which the center provides notice to the Agency under subparagraph (A)—

(i) confirms receipt of the notification under subparagraph (A); and

(ii) accepts the decision of the center.

(d) REPORT.—Not later than 6 months after the date of enactment of this Act, and annually thereafter, the Agency shall submit to the Committee on Small Business and Entrepreneurship and the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Small Business and the Committee on Energy and Commerce of the House of Representatives a report that describes—

(1) with respect to the period covered by the initial report—

(A) the programs and services developed and provided by the Agency, minority business centers, and minority chambers of commerce under subsection (b); and

(B) the initial efforts to provide those services under subsection (b); and

(2) with respect to subsequent years covered by the report—

(A) with respect to the grant program under subsection (b)—

(i) the efforts of the Agency, minority business centers, and minority chambers of commerce to develop services to assist minority business enterprises;

(ii) the challenges faced by owners of minority business enterprises in accessing services provided by the Agency, minority business centers, and minority chambers of commerce;

(iii) the number of unique minority business enterprises that were served by the Agency, minority business centers, or minority chambers of commerce; and

(iv) other relevant outcome performance data with respect to minority business enterprises, including the number of employees affected, the effect on sales, the disruptions of supply chains, and the efforts made by the Agency, minority business centers, and minority chambers of commerce to mitigate these effects .

(e) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated $10,000,000 to carry out this section, to remain available until expended.

**SEC. 1109. UNITED STATES TREASURY PROGRAM MANAGEMENT AUTHORITY.**

(a) DEFINITIONS.—In this section—

(1) the terms "appropriate Federal banking agency" and "insured depository institution" have the meanings given those terms in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813);

H. R. 748—25

(2) the term "insured credit union" has the meaning given the term in section 101 of the Federal Credit Union Act (12 U.S.C. 1752); and

(3) the term "Secretary" means the Secretary of the Treasury.

(b) AUTHORITY TO INCLUDE ADDITIONAL FINANCIAL INSTITUTIONS.—The Department of the Treasury, in consultation with the Administrator, and the Chairman of the Farm Credit Administration shall establish criteria for insured depository institutions, insured credit unions, institutions of the Farm Credit System chartered under the Farm Credit Act of 1971 (12 U.S.C. 2001 et seq.), and other lenders that do not already participate in lending under programs of the Administration, to participate in the paycheck protection program to provide loans under this section until the date on which the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the Coronavirus Disease 2019 (COVID–19) expires.

(c) SAFETY AND SOUNDNESS.—An insured depository institution, insured credit union, institution of the Farm Credit System chartered under the Farm Credit Act of 1971 (12 U.S.C. 2001 et seq.), or other lender may only participate in the program established under this section if participation does not affect the safety and soundness of the institution or lender, as determined by the Secretary in consultation with the appropriate Federal banking agencies or the National Credit Union Administration Board, as applicable.

(d) REGULATIONS FOR LENDERS AND LOANS.—

(1) IN GENERAL.—The Secretary may issue regulations and guidance as necessary to carry out the purposes of this section, including to—

(A) allow additional lenders to originate loans under this section; and

(B) establish terms and conditions for loans under this section, including terms and conditions concerning compensation, underwriting standards, interest rates, and maturity.

(2) REQUIREMENTS.—The terms and conditions established under paragraph (1) shall provide for the following:

(A) A rate of interest that does not exceed the maximum permissible rate of interest available on a loan of comparable maturity under paragraph (36) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), as added by section 1102 of this Act.

(B) Terms and conditions that, to the maximum extent practicable, are consistent with the terms and conditions required under the following provisions of paragraph (36) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), as added by section 1102 of this Act:

(i) Subparagraph (D), pertaining to borrower eligibility.

(ii) Subparagraph (E), pertaining to the maximum loan amount.

(iii) Subparagraph (F)(i), pertaining to allowable uses of program loans.

(iv) Subparagraph (H), pertaining to fee waivers.

(v) Subparagraph (M), pertaining to loan deferment.

H. R. 748—26

(C) A guarantee percentage that, to the maximum extent practicable, is consistent with the guarantee percentage required under subparagraph (F) of section 7(a)(2) of the Small Business Act (15 U.S.C. 636(a)(2)), as added by section 1102 of this Act.

(D) Loan forgiveness under terms and conditions that, to the maximum extent practicable, is consistent with the terms and conditions for loan forgiveness under section 1106 of this Act.

(e) ADDITIONAL REGULATIONS GENERALLY.—The Secretary may issue regulations and guidance as necessary to carry out the purposes of this section, including to allow additional lenders to originate loans under this title and to establish terms and conditions such as compensation, underwriting standards, interest rates, and maturity for under this section.

(f) CERTIFICATION.—As a condition of receiving a loan under this section, a borrower shall certify under terms acceptable to the Secretary that the borrower—

(1) does not have an application pending for a loan under section 7(a) of the Small Business Act (15 U.S.C. 636(a)) for the same purpose; and

(2) has not received such a loan during the period beginning on February 15, 2020 and ending on December 31, 2020.

(g) OPT-IN FOR SBA QUALIFIED LENDERS.—Lenders qualified to participate as a lender under 7(a) of the Small Business Act (15 U.S.C. 636(a)) may elect to participate in the paycheck protection program under the criteria, terms, and conditions established under this section. Such participation shall not preclude the lenders from continuing participation as a lender under section 7(a) of the Small Business Act (15 U.S.C. 636(a)).

(h) PROGRAM ADMINISTRATION.—With guidance from the Secretary, the Administrator shall administer the program established under this section, including the making and purchasing of guarantees on loans under the program, until the date on which the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the Coronavirus Disease 2019 (COVID–19) expires.

(i) CRIMINAL PENALTIES.—A loan under this section shall be deemed to be a loan under the Small Business Act (15 U.S.C. 631 et seq.) for purposes of section 16 of such Act (15 U.S.C. 645).

**SEC. 1110. EMERGENCY EIDL GRANTS.**

(a) DEFINITIONS.—In this section—

(1) the term "covered period" means the period beginning on January 31, 2020 and ending on December 31, 2020; and

(2) the term "eligible entity" means—

(A) a business with not more than 500 employees;

(B) any individual who operates under a sole proprietorship, with or without employees, or as an independent contractor;

(C) a cooperative with not more than 500 employees;

(D) an ESOP (as defined in section 3 of the Small Business Act (15 U.S.C. 632)) with not more than 500 employees; or

H. R. 748—27

(E) a tribal small business concern, as described in section 31(b)(2)(C) of the Small Business Act (15 U.S.C. 657a(b)(2)(C)), with not more than 500 employees.

(b) ELIGIBLE ENTITIES.—During the covered period, in addition to small business concerns, private nonprofit organizations, and small agricultural cooperatives, an eligible entity shall be eligible for a loan made under section 7(b)(2) of the Small Business Act (15 U.S.C. 636(b)(2)).

(c) TERMS; CREDIT ELSEWHERE.—With respect to a loan made under section 7(b)(2) of the Small Business Act (15 U.S.C. 636(b)(2)) in response to COVID–19 during the covered period, the Administrator shall waive—

(1) any rules related the personal guarantee on advances and loans of not more than $200,000 during the covered period for all applicants;

(2) the requirement that an applicant needs to be in business for the 1-year period before the disaster, except that no waiver may be made for a business that was not in operation on January 31, 2020; and

(3) the requirement in the flush matter following subparagraph (E) of section 7(b)(2) of the Small Business Act (15 U.S.C. 636(b)(2)), as so redesignated by subsection (f) of this section, that an applicant be unable to obtain credit elsewhere.

(d) APPROVAL AND ABILITY TO REPAY FOR SMALL DOLLAR LOANS.—With respect to a loan made under section 7(b)(2) of the Small Business Act (15 U.S.C. 636(b)(2)) in response to COVID–19 during the covered period, the Administrator may—

(1) approve an applicant based solely on the credit score of the applicant and shall not require an applicant to submit a tax return or a tax return transcript for such approval; or

(2) use alternative appropriate methods to determine an applicant's ability to repay.

(e) EMERGENCY GRANT.—

(1) IN GENERAL.—During the covered period, an entity included for eligibility in subsection (b), including small business concerns, private nonprofit organizations, and small agricultural cooperatives, that applies for a loan under section 7(b)(2) of the Small Business Act (15 U.S.C. 636(b)(2)) in response to COVID–19 may request that the Administrator provide an advance that is, subject to paragraph (3), in the amount requested by such applicant to such applicant within 3 days after the Administrator receives an application from such applicant.

(2) VERIFICATION.—Before disbursing amounts under this subsection, the Administrator shall verify that the applicant is an eligible entity by accepting a self-certification from the applicant under penalty of perjury pursuant to section 1746 of title 28 United States Code.

(3) AMOUNT.—The amount of an advance provided under this subsection shall be not more than $10,000.

(4) USE OF FUNDS.—An advance provided under this subsection may be used to address any allowable purpose for a loan made under section 7(b)(2) of the Small Business Act (15 U.S.C. 636(b)(2)), including—

(A) providing paid sick leave to employees unable to work due to the direct effect of the COVID–19;

H. R. 748—28

(B) maintaining payroll to retain employees during business disruptions or substantial slowdowns;

(C) meeting increased costs to obtain materials unavailable from the applicant's original source due to interrupted supply chains;

(D) making rent or mortgage payments; and

(E) repaying obligations that cannot be met due to revenue losses.

(5) REPAYMENT.—An applicant shall not be required to repay any amounts of an advance provided under this subsection, even if subsequently denied a loan under section 7(b)(2) of the Small Business Act (15 U.S.C. 636(b)(2)).

(6) UNEMPLOYMENT GRANT.—If an applicant that receives an advance under this subsection transfers into, or is approved for, the loan program under section 7(a) of the Small Business Act (15 U.S.C. 636(a)), the advance amount shall be reduced from the loan forgiveness amount for a loan for payroll costs made under such section 7(a).

(7) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated to the Administration $10,000,000,000 to carry out this subsection.

(8) TERMINATION.—The authority to carry out grants under this subsection shall terminate on December 31, 2020.

(f) EMERGENCIES INVOLVING FEDERAL PRIMARY RESPONSIBILITY QUALIFYING FOR SBA ASSISTANCE.—Section 7(b)(2) of the Small Business Act (15 U.S.C. 636(b)(2)) is amended—

(1) in subparagraph (A), by striking "or" at the end;

(2) in subparagraph (B), by striking "or" at the end;

(3) in subparagraph (C), by striking "or" at the end;

(4) by redesignating subparagraph (D) as subparagraph (E);

(5) by inserting after subparagraph (C) the following:

"(D) an emergency involving Federal primary responsibility determined to exist by the President under the section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5191(b)); or"; and

(6) in subparagraph (E), as so redesignated—

(A) by striking "or (C)" and inserting "(C), or (D)";

(B) by striking "disaster declaration" each place it appears and inserting "disaster or emergency declaration";

(C) by striking "disaster has occurred" and inserting "disaster or emergency has occurred";

(D) by striking "such disaster" and inserting "such disaster or emergency"; and

(E) by striking "disaster stricken" and inserting "disaster- or emergency-stricken"; and

(7) in the flush matter following subparagraph (E), as so redesignated, by striking the period at the end and inserting the following: ": *Provided further*, That for purposes of subparagraph (D), the Administrator shall deem that such an emergency affects each State or subdivision thereof (including counties), and that each State or subdivision has sufficient economic damage to small business concerns to qualify for assistance under this paragraph and the Administrator shall accept applications for such assistance immediately.".

H.R. 748—29

## SEC. 1111. RESOURCES AND SERVICES IN LANGUAGES OTHER THAN ENGLISH.

(a) IN GENERAL.—The Administrator shall provide the resources and services made available by the Administration to small business concerns in the 10 most commonly spoken languages, other than English, in the United States, which shall include Mandarin, Cantonese, Japanese, and Korean.

(b) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated to the Administrator $25,000,000 to carry out this section.

## SEC. 1112. SUBSIDY FOR CERTAIN LOAN PAYMENTS.

(a) DEFINITION OF COVERED LOAN.—In this section, the term "covered loan" means a loan that is—

(1) guaranteed by the Administration under—

(A) section 7(a) of the Small Business Act (15 U.S.C. 636(a))—

(i) including a loan made under the Community Advantage Pilot Program of the Administration; and

(ii) excluding a loan made under paragraph (36) of such section 7(a), as added by section 1102; or

(B) title V of the Small Business Investment Act of 1958 (15 U.S.C. 695 et seq.); or

(2) made by an intermediary to a small business concern using loans or grants received under section 7(m) of the Small Business Act (15 U.S.C. 636(m)).

(b) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) all borrowers are adversely affected by COVID–19;

(2) relief payments by the Administration are appropriate for all borrowers; and

(3) in addition to the relief provided under this Act, the Administration should encourage lenders to provide payment deferments, when appropriate, and to extend the maturity of covered loans, so as to avoid balloon payments or any requirement for increases in debt payments resulting from deferments provided by lenders during the period of the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the Coronavirus Disease 2019 (COVID–19).

(c) PRINCIPAL AND INTEREST PAYMENTS.—

(1) IN GENERAL.—The Administrator shall pay the principal, interest, and any associated fees that are owed on a covered loan in a regular servicing status—

(A) with respect to a covered loan made before the date of enactment of this Act and not on deferment, for the 6-month period beginning with the next payment due on the covered loan;

(B) with respect to a covered loan made before the date of enactment of this Act and on deferment, for the 6-month period beginning with the next payment due on the covered loan after the deferment period; and

(C) with respect to a covered loan made during the period beginning on the date of enactment of this Act and ending on the date that is 6 months after such date of enactment, for the 6-month period beginning with the first payment due on the covered loan.

H. R. 748—30

(2) TIMING OF PAYMENT.—The Administrator shall begin making payments under paragraph (1) on a covered loan not later than 30 days after the date on which the first such payment is due.

(3) APPLICATION OF PAYMENT.—Any payment made by the Administrator under paragraph (1) shall be applied to the covered loan such that the borrower is relieved of the obligation to pay that amount.

(d) OTHER REQUIREMENTS.—The Administrator shall—

(1) communicate and coordinate with the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, and State bank regulators to encourage those entities to not require lenders to increase their reserves on account of receiving payments made by the Administrator under subsection (c);

(2) waive statutory limits on maximum loan maturities for any covered loan durations where the lender provides a deferral and extends the maturity of covered loans during the 1-year period following the date of enactment of this Act; and

(3) when necessary to provide more time because of the potential of higher volumes, travel restrictions, and the inability to access some properties during the COVID–19 pandemic, extend lender site visit requirements to—

(A) not more than 60 days (which may be extended at the discretion of the Administration) after the occurrence of an adverse event, other than a payment default, causing a loan to be classified as in liquidation; and

(B) not more than 90 days after a payment default.

(e) RULE OF CONSTRUCTION.—Nothing in this section may be construed to limit the authority of the Administrator to make payments pursuant to subsection (c) with respect to a covered loan solely because the covered loan has been sold in the secondary market.

(f) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated to the Administrator $17,000,000,000 to carry out this section.

**SEC. 1113. BANKRUPTCY.**

(a) SMALL BUSINESS DEBTOR REORGANIZATION.—

(1) IN GENERAL.—Section 1182(1) of title 11, United States Code, is amended to read as follows:

"(1) DEBTOR.—The term 'debtor'—

"(A) subject to subparagraph (B), means a person engaged in commercial or business activities (including any affiliate of such person that is also a debtor under this title and excluding a person whose primary activity is the business of owning single asset real estate) that has aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $7,500,000 (excluding debts owed to 1 or more affiliates or insiders) not less than 50 percent of which arose from the commercial or business activities of the debtor; and

"(B) does not include—

"(i) any member of a group of affiliated debtors that has aggregate noncontingent liquidated secured

H. R. 748—31

and unsecured debts in an amount greater than $7,500,000 (excluding debt owed to 1 or more affiliates or insiders);

"(ii) any debtor that is a corporation subject to the reporting requirements under section 13 or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m, 78o(d)); or

"(iii) any debtor that is an affiliate of an issuer, as defined in section 3 of the Securities Exchange Act of 1934 (15 U.S.C. 78c).".

(2) APPLICABILITY OF CHAPTERS.—Section 103(i) of title 11, United States Code, is amended by striking "small business debtor" and inserting "debtor (as defined in section 1182)".

(3) APPLICATION OF AMENDMENT.—The amendment made by paragraph (1) shall apply only with respect to cases commenced under title 11, United States Code, on or after the date of enactment of this Act.

(4) TECHNICAL CORRECTIONS.—

(A) DEFINITION OF SMALL BUSINESS DEBTOR.—Section 101(51D)(B)(iii) of title 11, United States Code, is amended to read as follows:

"(iii) any debtor that is an affiliate of an issuer (as defined in section 3 of the Securities Exchange Act of 1934 (15 U.S.C. 78c).".

(B) UNCLAIMED PROPERTY.—Section 347(b) of title 11, United States Code, is amended by striking "1194" and inserting "1191".

(5) SUNSET.—On the date that is 1 year after the date of enactment of this Act, section 1182(1) of title 11, United States Code, is amended to read as follows:

"(1) DEBTOR.—The term 'debtor' means a small business debtor.".

(b) BANKRUPTCY RELIEF.—

(1) IN GENERAL.—

(A) EXCLUSION FROM CURRENT MONTHLY INCOME.—Section 101(10A)(B)(ii) of title 11, United States Code, is amended—

(i) in subclause (III), by striking "; and" and inserting a semicolon;

(ii) in subclause (IV), by striking the period at the end and inserting "; and"; and

(iii) by adding at the end the following:

"(V) Payments made under Federal law relating to the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the coronavirus disease 2019 (COVID–19).".

(B) CONFIRMATION OF PLAN.—Section 1325(b)(2) of title 11, United States Code, is amended by inserting "payments made under Federal law relating to the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the coronavirus disease 2019 (COVID–19)," after "other than".

(C) MODIFICATION OF PLAN AFTER CONFIRMATION.—Section 1329 of title 11, United States Code, is amended by adding at end the following:

H. R. 748—32

"(d)(1) Subject to paragraph (3), for a plan confirmed prior to the date of enactment of this subsection, the plan may be modified upon the request of the debtor if—

"(A) the debtor is experiencing or has experienced a material financial hardship due, directly or indirectly, to the coronavirus disease 2019 (COVID–19) pandemic; and

"(B) the modification is approved after notice and a hearing.

"(2) A plan modified under paragraph (1) may not provide for payments over a period that expires more than 7 years after the time that the first payment under the original confirmed plan was due.

"(3) Sections 1322(a), 1322(b), 1323(c), and the requirements of section 1325(a) shall apply to any modification under paragraph (1).".

(D) APPLICABILITY.—

(i) The amendments made by subparagraphs (A) and (B) shall apply to any case commenced before, on, or after the date of enactment of this Act.

(ii) The amendment made by subparagraph (C) shall apply to any case for which a plan has been confirmed under section 1325 of title 11, United States Code, before the date of enactment of this Act.

(2) SUNSET.—

(A) IN GENERAL.—

(i) EXCLUSION FROM CURRENT MONTHLY INCOME.—Section 101(10A)(B)(ii) of title 11, United States Code, is amended—

(I) in subclause (III), by striking the semicolon at the end and inserting "; and";

(II) in subclause (IV), by striking "; and" and inserting a period; and

(III) by striking subclause (V).

(ii) CONFIRMATION OF PLAN.—Section 1325(b)(2) of title 11, United States Code, is amended by striking "payments made under Federal law relating to the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the coronavirus disease 2019 (COVID–19),".

(iii) MODIFICATION OF PLAN AFTER CONFIRMATION.—Section 1329 of title 11, United States Code, is amended by striking subsection (d).

(B) EFFECTIVE DATE.—The amendments made by subparagraph (A) shall take effect on the date that is 1 year after the date of enactment of this Act.

**SEC. 1114. EMERGENCY RULEMAKING AUTHORITY.**

Not later than 15 days after the date of enactment of this Act, the Administrator shall issue regulations to carry out this title and the amendments made by this title without regard to the notice requirements under section 553(b) of title 5, United States Code.

H. R. 748—33

# TITLE II—ASSISTANCE FOR AMERICAN WORKERS, FAMILIES, AND BUSINESSES

## Subtitle A—Unemployment Insurance Provisions

**SEC. 2101. SHORT TITLE.**

This subtitle may be cited as the "Relief for Workers Affected by Coronavirus Act".

**SEC. 2102. PANDEMIC UNEMPLOYMENT ASSISTANCE.**

(a) DEFINITIONS.—In this section:

(1) COVID–19.—The term "COVID–19" means the 2019 Novel Coronavirus or 2019-nCoV.

(2) COVID–19 PUBLIC HEALTH EMERGENCY.—The term "COVID–19 public health emergency" means the public health emergency declared by the Secretary of Health and Human Services on January 27, 2020, with respect to the 2019 Novel Coronavirus.

(3) COVERED INDIVIDUAL.—The term "covered individual"—

(A) means an individual who—

(i) is not eligible for regular compensation or extended benefits under State or Federal law or pandemic emergency unemployment compensation under section 2107, including an individual who has exhausted all rights to regular unemployment or extended benefits under State or Federal law or pandemic emergency unemployment compensation under section 2107; and

(ii) provides self-certification that the individual—

(I) is otherwise able to work and available for work within the meaning of applicable State law, except the individual is unemployed, partially unemployed, or unable or unavailable to work because—

(aa) the individual has been diagnosed with COVID–19 or is experiencing symptoms of COVID–19 and seeking a medical diagnosis;

(bb) a member of the individual's household has been diagnosed with COVID–19;

(cc) the individual is providing care for a family member or a member of the individual's household who has been diagnosed with COVID–19;

(dd) a child or other person in the household for which the individual has primary caregiving responsibility is unable to attend school or another facility that is closed as a direct result of the COVID–19 public health emergency and such school or facility care is required for the individual to work;

(ee) the individual is unable to reach the place of employment because of a quarantine imposed as a direct result of the COVID–19 public health emergency;



## PAYCHECK PROTECTION PROGRAM (PPP) INFORMATION SHEET:

## BORROWERS

The Paycheck Protection Program ("PPP") authorizes up to $349 billion in forgivable loans to small businesses to pay their employees during the COVID-19 crisis. ***All loan terms will be the same for everyone.***

The loan amounts will be forgiven as long as:

- The loan proceeds are used to cover payroll costs, and most mortgage interest, rent, and utility costs over the 8 week period after the loan is made; and
- Employee and compensation levels are maintained.

Payroll costs are capped at $100,000 on an annualized basis for each employee. Due to likely high subscription, it is anticipated that not more than 25% of the forgiven amount may be for non-payroll costs.

Loan payments will be deferred for 6 months.

**When can I apply?**

- Starting April 3, 2020, small businesses and sole proprietorships can apply for and receive loans to cover their payroll and other certain expenses through existing SBA lenders.
- Starting April 10, 2020, independent contractors and self-employed individuals can apply for and receive loans to cover their payroll and other certain expenses through existing SBA lenders.
- Other regulated lenders will be available to make these loans as soon as they are approved and enrolled in the program.

**Where can I apply?** You can apply through any existing SBA lender or through any federally insured depository institution, federally insured credit union, and Farm Credit System institution that is participating. Other regulated lenders will be available to make these loans once they are approved and enrolled in the program. You should consult with your local lender as to whether it is participating. Visit www.sba.gov for a list of SBA lenders.

**Who can apply?** All businesses – including nonprofits, veterans organizations, Tribal business concerns, sole proprietorships, self-employed individuals, and independent contractors – with 500 or fewer employees can apply. Businesses in certain industries can have more than 500 employees if they meet applicable SBA employee-based size standards for those industries (click HERE for additional detail).

For this program, the SBA's affiliation standards are waived for small businesses (1) in the hotel and food services industries (click HERE for NAICS code 72 to confirm); or (2) that are franchises in the SBA's Franchise Directory (click HERE to check); or (3) that receive financial assistance from small business investment companies licensed by the SBA. Additional guidance may be released as appropriate.

**What do I need to apply?** You will need to complete the Paycheck Protection Program loan application and submit the application with the required documentation to an approved lender that is available to process your application by June 30, 2020. Click HERE for the application.

**What other documents will I need to include in my application?** You will need to provide your lender with payroll documentation.

**Do I need to first look for other funds before applying to this program?** No. We are waiving the usual SBA requirement that you try to obtain some or all of the loan funds from other sources (i.e., we are waiving the Credit Elsewhere requirement).

**How long will this program last?** Although the program is open until June 30, 2020, we encourage you to apply as quickly as you can because there is a funding cap and lenders need time to process your loan.

**How many loans can I take out under this program?** Only one.

**What can I use these loans for?** You should use the proceeds from these loans on your:

- Payroll costs, including benefits;
- Interest on mortgage obligations, incurred before February 15, 2020;
- Rent, under lease agreements in force before February 15, 2020; and
- Utilities, for which service began before February 15, 2020.

**What counts as payroll costs?** Payroll costs include:

- Salary, wages, commissions, or tips (capped at $100,000 on an annualized basis for each employee);
- Employee benefits including costs for vacation, parental, family, medical, or sick leave; allowance for separation or dismissal; payments required for the provisions of group health care benefits including insurance premiums; and payment of any retirement benefit;
- State and local taxes assessed on compensation; and
- For a sole proprietor or independent contractor: wages, commissions, income, or net earnings from self-employment, capped at $100,000 on an annualized basis for each employee.

**How large can my loan be?** Loans can be for up to two months of your average monthly payroll costs from the last year plus an additional 25% of that amount. That amount is subject to a $10 million cap. If you are a seasonal or new business, you will use different applicable time periods for your calculation. Payroll costs will be capped at $100,000 annualized for each employee.

**How much of my loan will be forgiven?** You will owe money when your loan is due if you use the loan amount for anything other than payroll costs, mortgage interest, rent, and utilities payments over the 8 weeks after getting the loan. Due to likely high subscription, it is anticipated that not more than 25% of the forgiven amount may be for non-payroll costs.

You will also owe money if you do not maintain your staff and payroll.

- **Number of Staff**: Your loan forgiveness will be reduced if you decrease your full-time employee headcount.
- **Level of Payroll**: Your loan forgiveness will also be reduced if you decrease salaries and wages by more than 25% for any employee that made less than $100,000 annualized in 2019.
- **Re-Hiring**: You have until June 30, 2020 to restore your full-time employment and salary levels for any changes made between February 15, 2020 and April 26, 2020.

**How can I request loan forgiveness?** You can submit a request to the lender that is servicing the loan. The request will include documents that verify the number of full-time equivalent employees and pay rates, as well as the payments on eligible mortgage, lease, and utility obligations. You must certify that the documents are true and that you used the forgiveness amount to keep employees and make eligible mortgage interest, rent, and utility payments. The lender must make a decision on the forgiveness within 60 days.

**What is my interest rate?** 0.50% fixed rate.

**When do I need to start paying interest on my loan?** All payments are deferred for 6 months; however, interest will continue to accrue over this period.

**When is my loan due?** In 2 years.

**Can I pay my loan earlier than 2 years?** Yes. There are no prepayment penalties or fees.

**Do I need to pledge any collateral for these loans?** No. No collateral is required.

**Do I need to personally guarantee this loan?** No. There is no personal guarantee requirement. \*\*\*However, if the proceeds are used for fraudulent purposes, the U.S. government will pursue criminal charges against you.\*\*\*

**What do I need to certify?** As part of your application, you need to certify in good faith that:

- Current economic uncertainty makes the loan necessary to support your ongoing operations.
- The funds will be used to retain workers and maintain payroll or to make mortgage, lease, and utility payments.
- You have not and will not receive another loan under this program.
- You will provide to the lender documentation that verifies the number of full-time equivalent employees on payroll and the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight weeks after getting this loan.
- Loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities. Due to likely high subscription, it is anticipated that not more than 25% of the forgiven amount may be for non-payroll costs.
- All the information you provided in your application and in all supporting documents and forms is true and accurate. Knowingly making a false statement to get a loan under this program is punishable by law.

- You acknowledge that the lender will calculate the eligible loan amount using the tax documents you submitted. You affirm that the tax documents are identical to those you submitted to the IRS.  And you also understand, acknowledge, and agree that the lender can share the tax information with the SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, for the purpose of compliance with SBA Loan Program Requirements and all SBA reviews.



SBA   INSPECTOR   GENERAL

# FLASH REPORT
## SMALL BUSINESS ADMINISTRATION'S
## IMPLEMENTATION OF THE PAYCHECK PROTECTION
## PROGRAM REQUIREMENTS

May 8, 2020







# EXECUTIVE SUMMARY

## SMALL BUSINESS ADMINISTRATION'S IMPLEMENTATION OF THE PAYCHECK PROTECTION PROGRAM REQUIREMENTS

Report No. 20-14

May 8, 2020

## Why We Did This

On April 24, 2020, the Office of Inspector General (OIG) initiated its planned review of the Small Business Administration's (SBA's) implementation of the Paycheck Protection Program (PPP). Based on this ongoing work, we produced a flash report to meet the information needs of Senators Schumer, Cardin, and Brown. We analyzed key provisions of Section 1102 of the Coronavirus Aid, Relief, and Economic Security (CARES) Act, which was signed into law by the President on March 27, 2020, to provide economic relief to our Nation, and SBA's Interim Final Rules and public guidance intended to further inform stakeholders of SBA's implementation of the PPP. Section1102, created the PPP under section 7(a) of the Small Business Act, and the PPP provided for $349 billion in fully guaranteed SBA loans, which can be forgiven if used in accordance with the Act.

SBA launched the program on April 3, 2020, and just 14 days later, by April 16, PPP lenders approved more than 1,661,000 loans totaling nearly $342.3 billion. On April 24, 2020, the President signed the Paycheck Protection Program and Health Care Enhancement Act to provide an additional $310 billion to the PPP. SBA initiated this cycle of additional funding on April 27, 2020. As of May 6, PPP lenders approved an additional 2,441,369 loans, totaling about $183.5 billion. The Paycheck Protection Program and Health Care Enhancement Act set aside portions of the additional funding for smaller lenders, but there were no other significant differences regarding requirements for the PPP than in the CARES Act.

The Senators also asked that by May 8, 2020, we provide recommendations on SBA's current rules, regulations, policies, and procedures to ensure small businesses get the money they need and are treated fairly by PPP lenders.

## What We Reviewed

To conduct our comparative analysis, we reviewed and assessed the regulations for the PPP and for the Paycheck Protection Program and Health Care Enhancement Act, in addition to guidance published in SBA's Interim Final Rules and FAQs issued as of April 30, 2020. We also assessed the PPP borrower application and additional public documents issued by SBA and the U.S. Department of the Treasury.

## What We Found

We found that SBA's Interim Final Rules for implementing the PPP and SBA's FAQs mostly aligned with the Act. We identified the following areas, however, that did not fully align with the Act's provisions:

- Prioritizing Underserved and Rural Markets
- Loan Proceeds Eligible for Forgiveness
- Guidance on Loan Deferments
- Registration of Loans

## Suggested Actions for SBA

To better align PPP requirements with the provisions of the CARES Act, we suggest SBA:

- Issue guidance to lenders requiring the lenders to prioritize borrowers in underserved markets and revise the borrower application to include collection of optional demographic information for the principals for the remaining available lending authority and any future lending under the program.
- For loans that are already disbursed, include optional demographic information on forms used to request loan forgiveness.
- Evaluate the potential negative impact to borrowers regarding the specified percentage of loan proceeds eligible for forgiveness and update the requirements, as deemed necessary.
- Issue guidance to lenders on the deferment process for PPP loans.
- Register PPP loans by Taxpayer Identification Number.



# Office of Inspector General
## U.S. Small Business Administration

**DATE:** May 8, 2020

**TO:** Jovita Carranza
Administrator

**FROM:** Hannibal "Mike" Ware
Inspector General

**SUBJECT:** Small Business Administration's Implementation of the Paycheck Protection
Program Requirements

On April 24, 2020, the Office of Inspector General (OIG) initiated its planned review of the Small
Business Administration's (SBA's) implementation of the Paycheck Protection Program (PPP).
Based on this ongoing work, we produced a flash report to meet the information needs of Senators
Schumer, Cardin, and Brown. We analyzed key provisions of the legislation, in addition to SBA's
Interim Final Rules and public guidance intended to further inform stakeholders of SBA's
implementation of the PPP. The Senators also asked that by May 8, 2020, we provide
recommendations on SBA's current rules, regulations, policies, and procedures to ensure small
businesses get the money they need and are treated fairly by any PPP lender. This report presents
the results of our analysis of key provisions of Section 1102 of the CARES Act and SBA's Interim
Final Rules and public guidance intended to further inform stakeholders of SBA's implementation of
the Paycheck Protection Program.

## Background

The President signed the Coronavirus Aid, Relief, and Economic Security (CARES) Act into law on
March 27, 2020, to provide economic relief to our Nation. One of the Act's largest provisions,
Section 1102, created the PPP under section 7(a) of the Small Business Act. This program provides
$349 billion in fully guaranteed SBA loans—which can be forgiven if used in accordance with the
Act—for certain eligible small businesses, individuals and non-profit organizations to cover payroll,
rent, utility payments, and other limited uses. Between March 27 and April 30, 2020, SBA published
seven Interim Final Rules and issued further guidance in 39 FAQs.

SBA was tasked with expediting the implementation of this unprecedented program to mitigate the
economic impact of social distancing efforts put forth to curb the infection rate of the COVID-19
outbreak. SBA launched the program on April 3, 2020, only 1 week after the Act was passed.
Demand for the program was extraordinary: by April 16, just 14 days after SBA launched the
program, PPP lenders approved more than 1,661,000 loans totaling nearly $342.3 billion.

Table 1 provides more specific loan information.

**Table 1: Summary of Paycheck Protection Program Loans From Round 1**
**(Data as of 12:00 p.m., Thursday, April 16, 2020)**

| Loan Count | Net Approved Dollars | Lender Count |
|---|---|---|
| 1,661,367 | $342,277,999,103 | 4,975 |

Source: SBA PPP website.

On April 24, 2020, the President signed the Paycheck Protection Program and Health Care Enhancement Act to provide an additional $310 billion to the PPP. SBA initiated this cycle of additional funding on April 27. As of May 6, PPP lenders approved an additional 2,441,369 loans totaling more than $183.5 billion. Table 2 provides more specific loan information.

**Table 2: Summary of Paycheck Protection Program Round 2**
**(Data as of 5:00 p.m., Wednesday, May 6, 2020)[1]**

| Lender Size | Approved Loans | Total Amount |
|---|---|---|
| >$50 B in Assets | 1,147,890 | $97,324,262,313 |
| $10 B to $50 B in Assets | 347,368 | $28,032,705,351 |
| <$10 B in Assets | 946,111 | $58,168,884,165 |
| **Total** | **2,441,369** | **$183,525,851,829** |

Before the PPP, SBA's largest single year in 7(a) lending volume was approximately $25.4 billion, in fiscal year 2017. Between April 3 and May 6, 2020, SBA lenders participating in the PPP approved 4,102,736 loans totaling more than $525.8 billion, an amount representing more than 20 times the largest year in SBA's history in just 33 days.

## Paycheck Protection Program Statutory Authority, Formal Guidance, and Other Guidance

### Statutory Authority

The PPP provides guaranteed loans to assist certain businesses, individuals, and organizations with getting back to work and outlines provisions for lending and forgiveness of these loans. The Paycheck Protection Program and Healthcare Enhancement Act on April 24, 2020, provided additional funding to the PPP. The Enhancement Act also included a set aside for insured depository institutions, credit unions, and community financial institutions.

### Formal Guidance

SBA also issued Interim Final Rules for the execution of these provisions consistent with the CARES Act. As of April 30, 2020, SBA issued seven Interim Final Rules. Appendix I includes the Interim Final Rules issued as of April 30, 2020.

---

[1] The information was retrieved from SBA's PPP Website.

***Other Guidance***

Additional guidance for the PPP is contained in FAQs and specific loan program forms. As of April 30, 2020, SBA responded to 39 FAQs that addressed various aspects of program implementation. These areas primarily related to program eligibility, loan size calculations, and loan sales on the secondary market.

Appendix II provides a detailed comparison of the CARES Act requirements, the Interim Final Rules, and the 39 FAQs.

## Scope

The scope of our review included an assessment of the following:

- Statutory authority for the PPP (Section 1102 of the CARES Act)
- Statutory authority for the Paycheck Protection Program and Health Care Enhancement Act
- Regulations published in SBA's seven Interim Final Rules issued as of April 30, 2020
- SBA's guidance published as 39 FAQs issued as of April 30, 2020
- SBA's PPP Borrower Application
- Additional public documents issued by SBA and the U.S. Department of the Treasury

## Results

We found that SBA's formal guidance, issued as its seven Interim Final Rules, for implementing the PPP and its FAQs mostly aligned with the Act. We identified the following areas, however, that did not fully align with the Act's provisions:

- Prioritizing Underserved and Rural Markets
- Loan Proceeds Eligible for Forgiveness
- Guidance on Loan Deferments
- Registration of Loans

**Prioritizing Underserved and Rural Markets**

We did not find any evidence that SBA issued guidance to lenders to prioritize the markets indicated by the Act. Further, SBA did not include the optional standard demographic information for principals on its PPP loan application. Section 1102 of the CARES Act states that the Administrator should issue guidance to lenders and agents to ensure that the processing and disbursement of covered loans prioritizes small business concerns and entities in underserved and rural markets, including veterans and members of the military community, small business concerns owned and controlled by socially and economically disadvantaged individuals (as defined in section 15 U.S.C. 637(d)(3)(C)), women, and businesses in operation for under 2 years.

Because SBA did not provide guidance to lenders about prioritizing borrowers in underserved and rural markets, these borrowers, including rural, minority and women-owned businesses may not have received the loans as intended. In addition, because SBA did not require demographic data to identify PPP borrowers in underserved markets, it is unlikely that SBA will be able to determine the loan volume to the intended prioritized markets.

**Loan Proceeds Eligible for Forgiveness**

We found the formal guidance in SBA's Interim Final Rule did not align with the allowable use requirements for PPP loans. The CARES Act details the allowable uses for PPP loans, including payroll costs, payments of interest on any mortgage obligation (which shall not include any prepayment of or payment of principal on a mortgage obligation), rent (including rent under a lease agreement), utilities, and interest on any other debt obligations incurred before the covered period. While the Act did not create any restrictions on the portion of the loan that needed to be used for payroll, SBA added a requirement in its Interim Final Rule, that at least 75 percent of the loan proceeds must be used for payroll. SBA, in coordination with the Secretary of the Treasury, provided the following explanation:

> While the Act provides that borrowers are eligible for forgiveness in an amount equal to the sum of payroll costs and any payments of mortgage interest, rent, and utilities, the Administrator has determined that the non-payroll portion of the forgivable loan amount should be limited to effectuate the core purpose of the statute and ensure finite program resources are devoted primarily to payroll. The Administrator has determined in consultation with the Secretary that 75 percent is an appropriate percentage in light of the Act's overarching focus on keeping workers paid and employed. Further, the Administrator and the Secretary believe that applying this threshold to loan forgiveness is consistent with the structure of the Act, which provides a loan amount 75 percent of which is equivalent to eight weeks of payroll (8 weeks/2.5 months = 56 days/76 days = 74 percent rounded up to 75 percent). Limiting non-payroll costs to 25 percent of the forgiveness amount will align these elements of the program and will also help to ensure that the finite appropriations available for PPP loan forgiveness are directed toward payroll protection.

In addition to the 75-percent payroll criteria, the maturity term established by the Administrator and the Secretary would require the borrowers to repay any amount not eligible for forgiveness within the remainder of the initial 2-year term. The Act, however, allowed for a maximum maturity of up to 10 years. SBA's requirements could result in an unintended burden to the borrowers. For example, PPP borrowers who do not use at least 75 percent of the loan for payroll (therefore use more than 25 percent of their loan proceeds for nonpayroll expenses) may not be able to have all of their loan forgiven. It may be important to consider that many small businesses have more operational expenses than employee expenses. Our review of data from round one found that tens of thousands of borrowers would not meet the 75-percent payroll cost threshold and would therefore have to repay the amount of nonpayroll costs in excess of 25 percent in less than 2 years.

**Guidance on Loan Deferments**

We found that SBA did not issue guidance on the deferment process for PPP loans to lenders within 30 days as required. Specifically, the Act requires SBA to provide guidance to lenders on the deferment process within 30 days of enactment (March 27, 2020). Section 1102 of the CARES Act requires lenders to provide complete payment deferment relief for impacted borrowers with covered loans for a period of not less than 6 months (including payment of principal, interest, and fees) and not more than 1 year. As of May 5, 2020, we found no evidence that SBA issued this guidance.

Without proper and timely guidance for loan deferments, lenders and borrowers may be uncertain about program requirements for servicing and loan repayments for PPP loans with balances

remaining after forgiveness. Specifically, lenders may not be adequately prepared to service PPP loans that carry balances, and borrowers may not know what is required to repay outstanding loan balances.

**Registration of Loans**

We found no evidence that SBA registered the loans as required by the Act. While SBA collects the applicant's Taxpayer Identification Number (TIN), we did not find it registered this information. Section 1102 states that not later than 15 days after the date on which a loan is made, SBA shall register the loan using the TIN assigned to the borrower.

## Suggested Actions for SBA

To better align PPP requirements with the provisions of the CARES Act we suggest that SBA:

- Issue guidance to lenders requiring the lenders to prioritize borrowers in underserved markets and revise the PPP borrower application to include the collection of optional demographic information for principals for the remaining available lending authority and any future lending under the program.
- For loans that are already disbursed, include optional demographic information on forms used to request loan forgiveness.
- Evaluate the potential negative impact to borrowers regarding the specified percentage of loan proceeds eligible for forgiveness and update the requirements, as deemed necessary.
- Issue guidance to lenders on the deferment process for PPP loans.
- Register PPP loans by TIN.

## Disclaimer

This report compares and contrasts key provisions of Section 1102of the CARES Act to SBA's Interim Final Rules and other public guidance to further inform stakeholders of SBA's implementation of the PPP. We are performing our ongoing review of SBA's implementation of the PPP under the Council of the Inspectors General for Integrity and Efficiency's Quality Standards for Inspection and Evaluation, but we have not prepared this flash report to meet this standard.

If you have any questions, please contact me at 202-205-6586 or Andrea Deadwyler, Assistant Inspector General for Audits, at 202-205-6616.

cc:  William Manger, Chief of Staff and Associate Administrator, Office of Capital Access
    Brittany Biles, General Counsel
    John Miller, Deputy Associate Administrator, Office of Capital Access
    William Briggs, Deputy Associate Administrator, Office of Capital Access
    Dianna Seaborn, Director, Office of Financial Assistance
    Jihoon Kim, Director, Office of Financial Program Operations
    Susan Streich, Director, Office of Credit Risk Management
    Martin Conrey, Attorney Advisor, Legislation and Appropriations
    Tami Perriello, Chief Financial Officer
    Tonia Butler, Director, Office of Internal Controls

## Appendix I: Interim Final Rules

| Interim Final Rule Number | Subject | Date Issued |
|:---:|---|---|
| 1 | Paycheck Protection Program | April 2, 2020 |
| 2 | Affiliation Rules | April 3, 2020 |
| 3 | Additional Eligibility Criteria and Requirements for Certain Pledges of Loans for the Paycheck Protection Program | April 14, 2020 |
| 4 | Promissory Notes, Authorizations, Affiliation, and Eligibility | April 24, 2020 |
| 5 | Seasonal Employers | April 27, 2020 |
| 6 | Disbursements | April 28, 2020 |
| 7 | Requirements – Corporate Groups and Non-Bank and Non-Insured Depository Institution Lenders | April 30, 2020 |

**Appendix II: Detailed Comparison**

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(A)(viii) The term 'payroll costs'- <br><br> (I) means <br> (aa) the sum of payments of any compensation with respect to employees that is a— <br><br> (AA) salary, wage, commission, or similar compensation; <br> (BB) payment of cash tip or equivalent; <br> (CC) payment for vacation, parental, family medical, or sick leave; <br> (DD) allowance for dismissal or separation; <br> (EE) payment required for the provisions of group health care benefits, including insurance premiums; <br> (FF) payment of any retirement benefit; or <br> (GG) payment of State or local tax assessed on the compensation of employees <br><br> "(bb) the sum of payments of any compensation to or income of a sole proprietor or independent contractor that is a wage, commission, income, net earnings from self employment, or similar compensation and that is in an amount that is not more than $100,000 in 1 year, as prorated for the covered period; And | Interim Final Rule 1, Issued April 2, 2020, (IFR1) Section III(2)[f]. What qualifies as "payroll costs?" <br><br> Payroll costs consist of compensation to employees (whose principal place of residence is the United States) in the form of salary, wages, commissions, or similar compensation; cash tips or the equivalent (based on employer records of past tips or, in the absence of such records, a reasonable, good-faith employer estimate of such tips); payment for vacation, parental, family, medical, or sick leave; allowance for separation or dismissal; payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums, and retirement; payment of state and local taxes assessed on compensation of employees; and for an independent contractor or sole proprietor, wages, commissions, income, or net earnings from self-employment, or similar compensation. | FAQ # 7: The CARES Act excludes from the definition of payroll costs any employee compensation in excess of an annual salary of $100,000. Does that exclusion apply to all employee benefits of monetary value? <br><br> Answer: No. The exclusion of compensation in excess of $100,000 annually applies only to cash compensation, not to non-cash benefits, including: <br> - employer contributions to defined-benefit or defined-contribution retirement plans; <br> - payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums; and <br> - payment of state and local taxes assessed on compensation of employees. <br><br> FAQ # 8: Do PPP loans cover paid sick leave? <br><br> Answer: Yes. PPP loans covers payroll costs, including costs for employee vacation, parental, family, medical, and sick leave. However, the CARES Act excludes qualified sick and family leave wages for which a credit is allowed under sections 7001 and 7003 of the Families First Coronavirus Response Act (Public Law 116–127). Learn more about the Paid Sick Leave Refundable Credit here. |

8

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(A)(viii) The term 'payroll costs'-<br><br>"(II) shall not include—<br><br>"(aa) the compensation of an individual employee in excess of an annual salary of $100,000, as prorated for the covered period;<br><br>"(bb) taxes imposed or withheld under chapters 21, 22, or 24 of the Internal Revenue Code of 1986 during the covered period;<br><br>"(cc) any compensation of an employee whose principal place of residence is outside of the United States;<br><br>"(dd) qualified sick leave wages for which a credit is allowed under section 7001 of the Families First Coronavirus Response Act (Public Law 116–127); or<br><br>"(ee) qualified family leave wages for which a credit is allowed under section 7003 of the Families First Coronavirus Response Act (Public Law 116–127); | IFR1 Section III(2)(f). What qualifies as "payroll costs?"<br><br>Payroll costs consist of compensation to employees (whose principal place of residence is the United States) in the form of salary, wages, commissions, or similar compensation; cash tips or the equivalent (based on employer records of past tips or, in the absence of such records, a reasonable, good-faith employer estimate of such tips); payment for vacation, parental, family, medical, or sick leave; allowance for separation or dismissal; payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums, and retirement; payment of state and local taxes assessed on compensation of employees; and for an independent contractor or sole proprietor, wages, commissions, income, or net earnings from self-employment, or similar compensation. | FAQ # 7: The CARES Act excludes from the definition of payroll costs any employee compensation in excess of an annual salary of $100,000. Does that exclusion apply to all employee benefits of monetary value?<br><br>Answer: No. The exclusion of compensation in excess of $100,000 annually applies only to cash compensation, not to non-cash benefits, including:<br>- employer contributions to defined-benefit or defined-contribution retirement plans;<br>- payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums; and<br>- payment of state and local taxes assessed on compensation of employees. |

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(B) PAYCHECK PROTECTION LOANS.— Except as otherwise provided in this paragraph, the Administrator may guarantee covered loans under the same terms, conditions, and processes as a loan made under this subsection. | IFR1 Section III(4)a. What are the loan terms and conditions? Loans will be guaranteed under the PPP under the same terms, conditions and processes as other 7(a) loans, with certain changes including but not limited to: i. The guarantee percentage is 100 percent. ii. No collateral will be required. iii. No personal guarantees will be required. iv. The interest rate will be 100 basis points or one percent. v. All loans will be processed by all lenders under delegated authority and lenders will be permitted to rely on certifications of the borrower in order to determine eligibility of the borrower and the use of loan proceeds. | We did not identify any FAQ that related directly to this requirement. |
| Section 1102(a)(2)(C) REGISTRATION OF LOANS.— Not later than 15 days after the date on which a loan is made under this paragraph, the Administration shall register the loan using the TIN (as defined in section 7701 of the Internal Revenue Code of 1986) assigned to the borrower. | We did not identify any requirements in the Interim Final Rules as of April 30, 2020 that related directly to this requirement. | We did not identify any FAQ that related directly to this requirement. |

10

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(D) INCREASED ELIGIBILITY FOR CERTAIN SMALL BUSINESSES AND ORGANIZATIONS.— "(i) IN GENERAL.—During the covered period, in addition to small business concerns, any business concern, nonprofit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) shall be eligible to receive a covered loan if the business concern, nonprofit organization, veterans organization, or Tribal business concern employs not more than the greater of— "(I) 500 employees; or "(II) if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, nonprofit organization, veterans organization, or Tribal business concern operates. | IFR1 Section III(2)(a) Am I eligible? You are eligible for a PPP loan if you have 500 or fewer employees whose principal place of residence is in the United States, or are a business that operates in a certain industry and meet the applicable SBA employee-based size standards for that industry, and: i. You are: A. A small business concern as defined in section 3 of the Small Business Act (15 USC 632), and subject to SBA's affiliation rules under 13 CFR 121.301(f) unless specifically waived in the Act; B. A tax-exempt nonprofit organization described in section 501(c)(3) of the Internal Revenue Code (IRC), a tax-exempt veterans organization described in section 501(c)(19) of the IRC, Tribal business concern described in section 31(b)(2)(C) of the Small Business Act, or any other business; and ii. You were in operation on February 15, 2020 and either had employees for whom you paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099-MISC. You are also eligible for a PPP loan if you are an individual who operates under a sole proprietorship or as an independent contractor or eligible self-employed individual, you were in operation on February 15, 2020. | FAQ # 2: Are small business concerns (as defined in section 3 of the Small Business Act, 15 U.S.C. 632) required to have 500 or fewer employees to be eligible borrowers in the PPP? Answer: No. Small business concerns can be eligible borrowers even if they have more than 500 employees, as long as they satisfy the existing statutory and regulatory definition of a "small business concern" under section 3 of the Small Business Act, 15 U.S.C. 632. A business can qualify if it meets the SBA employee-based or revenue-based size standard corresponding to its primary industry. Go to www.sba.gov/size for the industry size standards. Additionally, a business can qualify for the Paycheck Protection Program as a small business concern if it met both tests in SBA's "alternative size standard" as of March 27, 2020: (1) maximum tangible net worth of the business is not more than $15 million; and (2) the average net income after Federal income taxes (excluding any carry-over losses) of the business for the two full fiscal years before the date of the application is not more than $5 million. A business that qualifies as a small business concern under section 3 of the Small Business Act, 15 U.S.C. 632, may truthfully attest to its eligibility for PPP loans on the Borrower Application Form, unless otherwise ineligible. |

11

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(D)(ii) INCLUSION OF SOLE PROPRIETORS, INDEPENDENT CONTRACTORS, AND ELIGIBLE SELF-EMPLOYED INDIVIDUALS.— "(I) IN GENERAL.—During the covered period, individuals who operate under a sole proprietorship or as an independent contractor and eligible self-employed individuals shall be eligible to receive a covered loan. "(II) DOCUMENTATION.—An eligible self-employed individual, independent contractor, or sole proprietorship seeking a covered loan shall submit such documentation as is necessary to establish such individual as eligible, including payroll tax filings reported to the Internal Revenue Service, Forms 1099-MISC, and income and expenses from the sole proprietorship, as determined by the Administrator and the Secretary. | IFR1 Section III(2)(a) Am I eligible? You are also eligible for a PPP loan if you are an individual who operates under a sole proprietorship or as an independent contractor or eligible self-employed individual, you were in operation on February 15, 2020. You must also submit such documentation as is necessary to establish eligibility such as payroll processor records, payroll tax filings, or Form 1099-MISC, or income and expenses from a sole proprietorship. For borrowers that do not have any such documentation, the borrower must provide other supporting documentation, such as bank records, sufficient to demonstrate the qualifying payroll amount. SBA intends to promptly issue additional guidance with regard to the applicability of affiliation rules at 13 CFR §§ 121.103 and 121.301 to PPP loans | FAQ # 15: Should payments that an eligible borrower made to an independent contractor or sole proprietor be included in calculations of the eligible borrower's payroll costs? Answer: No. Any amounts that an eligible borrower has paid to an independent contractor or sole proprietor should be excluded from the eligible business's payroll costs. However, an independent contractor or sole proprietor will itself be eligible for a loan under the PPP, if it satisfies the applicable requirements. |

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(D)(iii) BUSINESS CONCERNS WITH MORE THAN 1 PHYSICAL LOCATION.— During the covered period, any business concern that employs not more than 500 employees per physical location of the business concern and that is assigned a North American Industry Classification System code beginning with 72 at the time of disbursal shall be eligible to receive a covered loan. | Interim Final Rule on Applicable Affiliation Rules, Issued April 3, 2020, (IFR2) Section III(1)<br><br>How do SBA's affiliation rules affect my eligibility and apply to me under the PPP?<br><br>An entity generally is eligible for the PPP if it, combined with its affiliates, is a small business as defined in section 3 of the Small Business Act (15 U.S.C. 632), or (1) has 500 or fewer employees whose principal place of residence is in the United States or is a business that operates in a certain industry and meets applicable SBA employee-based size standards for that industry, and (2) is a tax-exempt nonprofit organization described in section 501(c)(3) of the Internal Revenue Code (IRC), a tax-exempt veterans organization described in section 501(c)(19) of the IRC, a Tribal business concern described in section 31(b)(2)(C) of the Small Business Act, or any other business concern. Prior to the Act, the nonprofit organizations listed above were not eligible for SBA Business Loan Programs under section 7(a) of the Small Business Act; only for-profit small business concerns were eligible. *For brevity, we excluded additional text from the Interim Final Rule. | FAQ # 24: How do the $10 million cap and affiliation rules work for hotels and restaurants (and any business assigned a North American Industry Classification System (NAICS) code beginning with 72)?<br><br>Answer: Under the CARES Act, any single business entity that is assigned a NAICS code beginning with 72 (including hotels and restaurants) and that employs not more than 500 employees per physical location is eligible to receive a PPP loan.<br><br>In addition, SBA's affiliation rules (13 CFR 121.103 and 13 CFR 121.301) do not apply to any business entity that is assigned a NAICS code beginning with 72 and that employs not more than a total of 500 employees. As a result, if each hotel or restaurant location owned by a parent business is a separate legal business entity, each hotel or restaurant location that employs not more than 500 employees is permitted to apply for a separate PPP loan provided it uses its unique EIN.<br><br>The $10 million maximum loan amount limitation applies to each eligible business entity, because individual business entities cannot apply for more than one loan. The following examples illustrate how these principles apply. |

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(D)(iv) WAIVER OF AFFILIATION RULES.—During the covered period, the provisions applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations, or any successor regulation, are waived with respect to eligibility for a covered loan for— | IFR2 Section III. Affiliate Rules for Paycheck Protection Program | FAQ # 23: How do the $10 million cap and affiliation rules work for franchises? |
| "(I) any business concern with not more than 500 employees that, as of the date on which the covered loan is disbursed, is assigned a North American Industry Classification System code beginning with 72; | 1. Affiliation Rules Generally | Answer: If a franchise brand is listed on the SBA Franchise Directory, each of its franchisees that meets the applicable size standard can apply for a PPP loan. (The franchisor does not apply on behalf of its franchisees.) The $10 million cap on PPP loans is a limit per franchisee entity, and each franchisee is limited to one PPP loan. |
| "(II) any business concern operating as a franchise that is assigned a franchise identifier code by the Administration; and | Are affiliates considered together for purposes of determining eligibility? | |
| "(III) any business concern that receives financial assistance from a company licensed under section 301 of the Small Business Investment Act of 1958 (15 U.S.C. 681). | In most cases, a borrower will be considered together with its affiliates for purposes of determining eligibility for the PPP. | Franchise brands that have been denied listing on the Directory because of affiliation between the franchisor and franchisee may request listing to receive PPP loans. SBA will not apply affiliation rules to a franchise brand requesting listing on the Directory to participate in the PPP, but SBA will confirm that the brand is otherwise eligible for listing on the Directory. |
| | Section 7(a)(36)(D)(iv) of the Small Business Act (15 U.S.C. 636(a)(36)(D)(iv), as added by the Act, waives the affiliation rules contained in § 121.103 for (1) any business concern with not more than 500 employees that, as of the date on which the loan is disbursed, is assigned a North American Industry Classification System code beginning with 72; (2) any business concern operating as a franchise that is assigned a franchise identifier code by the Administration; and (3) any business concern that receives financial assistance from a company licensed under section 301 of the Small Business Investment Act of 1958 (15 U.S.C. 681). This Interim Final Rule has no effect on these statutory waivers, which remain in full force and effect. As a result, the affiliation rules contained in section 121.301 also do not apply to these types of entities. | |

14

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(D)(v) EMPLOYEE.—For purposes of determining whether a business concern, nonprofit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) employs not more than 500 employees under clause (i)(I), the term 'employee' includes individuals employed on a full-time, part-time, or other basis. | IFR2 Section III(3) § 121.103 How does SBA determine affiliation?"<br><br>In addition, the eligibility criteria set forth in 15 U.S.C. 636(a)(36)(D) are satisfied for any faith based organization having not more than 500 employees (including individuals employed on a full-time, part-time, or other basis) that pays federal payroll taxes using its own Internal Revenue Service Employer Identification Number (EIN) or that would be eligible for a deduction under the second sentence of 26 U.S.C. 512(b)(12) if the organization earned unrelated business taxable income. | FAQ 36: To determine borrower eligibility under the 500-employee or other applicable threshold established by the CARES Act, must a borrower count all employees or only full-time equivalent employees?<br><br>Answer: For purposes of loan eligibility, the CARES Act defines the term employee to include "individuals employed on a full-time, part-time, or other basis." A borrower must therefore calculate the total number of employees, including part-time employees, when determining their employee headcount for purposes of the eligibility threshold. For example, if a borrower has 200 full-time employees and 50 part-time employees each working 10 hours per week, the borrower has a total of 250 employees. By contrast, for purposes of loan forgiveness, the CARES Act uses the standard of "fulltime equivalent employees" to determine the extent to which the loan forgiveness amount will be reduced in the event of workforce reductions. |

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(D)(vi) AFFILIATION.—The provisions applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations, or any successor thereto, shall apply with respect to a nonprofit organization and a veterans organization in the same manner as with respect to a small business concern. | IFR2 Section III(1) How do SBA's affiliation rules affect my eligibility and apply to me under the PPP? | FAQ 3: Does my business have to qualify as a small business concern (as defined in section 3 of the Small Business Act, 15 U.S.C. 632) in order to participate in the PPP? |
| | The Act made such nonprofit organizations not only eligible for the PPP, but also subjected them to SBA's affiliation rules. Specifically, section 1102 of the Act provides that the provisions applicable to affiliations under 13 CFR 121.103 apply with respect to nonprofit organizations and veterans organizations in the same manner as with respect to small business concerns. However, the detailed affiliation standards contained in section 121.103 currently do not apply to PPP borrowers, because section 121.103(a)(8) provides that applicants in SBA's Business Loan Programs (which include the PPP) are subject to the affiliation rule contained in 13 CFR 121.301. | Answer: In addition to small business concerns, a business is eligible for a PPP loan if the business has 500 or fewer employees whose principal place of residence is in the United States, or the business meets the SBA employee-based size standards for the industry in which it operates (if applicable). Similarly, PPP loans are also available for qualifying tax-exempt nonprofit organizations described in section 501(c)(3) of the Internal Revenue Code (IRC), tax-exempt veterans organization described in section 501(c)(19) of the IRC, and Tribal business concerns described in section 31(b)(2)(C) of the Small Business Act that have 500 or fewer employees whose principal place of residence is in the United States, or meet the SBA employee-based size standards for the industry in which they operate. |

16

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(E) MAXIMUM LOAN AMOUNT.—During the covered period, with respect to a covered loan, the maximum loan amount shall be the lesser of—<br><br>"(i)(I) the sum of—<br><br>"(aa) the average total monthly payments by the applicant for payroll costs incurred during the 1-year period before the date on which the loan is made, except that, in the case of an applicant that is seasonal employer, as determined by the Administrator, the average total monthly payments for payroll shall be for the 12-week period beginning February 15, 2019, or at the election of the eligible recipient, March 1, 2019, and ending June 30, 2019; by<br><br>"(BB) 2.5; and<br><br>"(bb) the outstanding amount of a loan under subsection (b)(2) that was made during the period beginning on January 31, 2020 and ending on the date on which covered loans are made available to be refinanced under the covered loan; or | IFR1 Section III(2)d. I have determined that I am eligible. How much can I borrow?<br><br>Under the PPP, the maximum loan amount is the lesser of $10 million or an amount that you will calculate using a payroll-based formula specified in the Act, as explained below.<br><br>Section III(2)e. How do I calculate the maximum amount I can borrow?<br><br>The following methodology, which is one of the methodologies contained in the Act, will be most useful for many applicants.<br><br>i. Step 1: Aggregate payroll costs (defined in detail below in f.) from the last twelve months for employees whose principal place of residence is the United States.<br><br>ii. Step 2: Subtract any compensation paid to an employee in excess of an annual salary of $100,000 and/or any amounts paid to an independent contractor or sole proprietor in excess of $100,000 per year.<br><br>iii. Step 3: Calculate average monthly payroll costs (divide the amount from Step 2 by 12).<br><br>iv. Step 4: Multiply the average monthly payroll costs from Step 3 by 2.5.<br><br>v. Step 5: Add the outstanding amount of an Economic Injury Disaster Loan (EIDL) made between January 31, 2020 and April 3, 2020, less the amount of any "advance" under an EIDL COVID-19 loan (because it does not have to be repaid). | FAQ 9: My small business is a seasonal business whose activity increases from April to June. Considering activity from that period would be a more accurate reflection of my business's operations. However, my small business was not fully ramped up on February 15, 2020. Am I still eligible?<br><br>Answer: In evaluating a borrower's eligibility, a lender may consider whether a seasonal borrower was in operation on February 15, 2020 or for an 8-week period between February 15, 2019 and June 30, 2019. |

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| "(aa) the product obtained by multiplying—<br><br>"(AA) the average total monthly payments by the applicant for payroll costs incurred during the period beginning on January 1, 2020 and ending on February 29, 2020; by<br><br>"(BB) 2.5; and<br><br>"(bb) the outstanding amount of a loan under subsection (b)(2) that was made during the period beginning on January 31, 2020 and ending on the date on which covered loans are made available to be refinanced under the covered loan; or<br><br>"(ii) $10,000,000. | (Continued from previous page)<br><br>(II) if requested by an otherwise eligible recipient that was not in business during the period beginning on February 15, 2019 and ending on June 30, 2019, the sum of— | FAQ 14: What time period should borrowers use to determine their number of employees and payroll costs to calculate their maximum loan amounts?<br><br>Answer: In general, borrowers can calculate their aggregate payroll costs using data either from the previous 12 months or from calendar year 2019. For seasonal businesses, the applicant may use average monthly payroll for the period between February 15, 2019, or March 1, 2019, and June 30, 2019. An applicant that was not in business from February 15, 2019 to June 30, 2019 may use the average monthly payroll costs for the period January 1, 2020 through February 29, 2020.<br><br>Borrowers may use their average employment over the same time periods to determine their number of employees, for the purposes of applying an employee-based size standard. Alternatively, borrowers may elect to use SBA's usual calculation: the average number of employees per pay period in the 12 completed calendar months prior to the date of the loan application (or the average number of employees for each of the pay periods that the business has been operational, if it has not been operational for 12 months). |

18

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(F) ALLOWABLE USES OF COVERED LOANS.— "(i) IN GENERAL.—During the covered period, an eligible recipient may, in addition to the allowable uses of a loan made under this subsection, use the proceeds of the covered loan for— "(I) payroll costs; "(II) costs related to the continuation of group health care benefits during periods of paid sick, medical, or family leave, and insurance premiums; "(III) employee salaries, commissions, or similar compensations; "(IV) payments of interest on any mortgage obligation (which shall not include any prepayment of or payment of principal on a mortgage obligation); "(V) rent (including rent under a lease agreement); "(VI) utilities; and "(VII) interest on any other debt obligations that were incurred before the covered period. | IFR1 Section III(2)r. The proceeds of a PPP loan are to be used for: i. payroll costs (as defined in the Act and in 2.f.); ii. costs related to the continuation of group health care benefits during periods of paid sick, medical, or family leave, and insurance premiums; iii. mortgage interest payments (but not mortgage prepayments or principal payments); iv. rent payments; v. utility payments; vi. interest payments on any other debt obligations that were incurred before February 15, 2020; and/or vii. refinancing an SBA EIDL loan made between January 31, 2020 and April 3, 2020. If you received an SBA EIDL loan from January 31, 2020 through April 3, 2020, you can apply for a PPP loan. If your EIDL loan was not used for payroll costs, it does not affect your eligibility for a PPP loan. If your EIDL loan was used for payroll costs, your PPP loan must be used to refinance your EIDL loan. Proceeds from any advance up to $10,000 on the EIDL loan will be deducted from the loan forgiveness amount on the PPP loan. However, at least 75 percent of the PPP loan proceeds shall be used for payroll costs. | FAQ 7: The CARES Act excludes from the definition of payroll costs any employee compensation in excess of an annual salary of $100,000. Does that exclusion apply to all employee benefits of monetary value? Answer: No. The exclusion of compensation in excess of $100,000 annually applies only to cash compensation, not to non-cash benefits, including: - employer contributions to defined-benefit or defined-contribution retirement plans; - payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums; and - payment of state and local taxes assessed on compensation of employees. FAQ 8: Do PPP loans cover paid sick leave? Answer: Yes. PPP loans covers payroll costs, including costs for employee vacation, parental, family, medical, and sick leave. However, the CARES Act excludes qualified sick and family leave wages for which a credit is allowed under sections 7001 and 7003 of the Families First Coronavirus Response Act (Public Law 116–127). Learn more about the Paid Sick Leave Refundable Credit here. |

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| *(Continued from previous page)* | *(Continued from previous page)* | FAQ 15: Should payments that an eligible borrower made to an independent contractor or sole proprietor be included in calculations of the eligible borrower's payroll costs?<br><br>Answer: No. Any amounts that an eligible borrower has paid to an independent contractor or sole proprietor should be excluded from the eligible business's payroll costs. However, an independent contractor or sole proprietor will itself be eligible for a loan under the PPP, if it satisfies the applicable requirements.<br><br>FAQ 32: Does the cost of a housing stipend or allowance provided to an employee as part of compensation count toward payroll costs?<br><br>Answer: Yes. Payroll costs includes all cash compensation paid to employees, subject to the $100,000 annual compensation per employee limitation. |

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(F)(ii) DELEGATED AUTHORITY.— | IFR1 Section III(3)a. Who is eligible to make PPP loans? | We did not identify any FAQ that related directly to this requirement. |
| "(I) IN GENERAL.—For purposes of making covered loans for the purposes described in clause (i), a lender approved to make loans under this subsection shall be deemed to have been delegated authority by the Administrator to make and approve covered loans, subject to the provisions of this paragraph. | i. All SBA 7(a) lenders are automatically approved to make PPP loans on a delegated basis. | |
| "(II) CONSIDERATIONS.—In evaluating the eligibility of a borrower for a covered loan with the terms described in this paragraph, a lender shall consider whether the borrower— | ii. The Act provides that the authority to make PPP loans can be extended to additional lenders determined by the Administrator and the Secretary to have the necessary qualifications to process, close, disburse, and service loans made with the SBA guarantee. Since SBA is authorized to make PPP loans up to $349 billion by June 30, 2020, the Administrator and the Secretary have jointly determined that authorizing additional lenders is necessary to achieve the purpose of allowing as many eligible borrowers as possible to receive loans by the June 30, 2020 deadline. | |
| "(aa) was in operation on February 15, 2020; and | | |
| "(bb)(AA) had employees for whom the borrower paid salaries and payroll taxes; or | | |
| "(BB) paid independent contractors, as reported on a Form 1099-MISC. | | |

21

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(F)(iii) ADDITIONAL LENDERS. — The authority to make loans under this paragraph shall be extended to additional lenders determined by the Administrator and the Secretary of the Treasury to have the necessary qualifications to process, close, disburse and service loans made with the guarantee of the Federal government that addresses unsafe or unsound lending practices: Administration. | IFR1 Section III(3)(a)(iii). The following types of lenders have been determined to meet the criteria and are eligible to make PPP loans unless they currently are designated in Troubled Condition by their primary Federal regulator or are subject to a formal enforcement action with their primary Federal regulator that addresses unsafe or unsound lending practices:<br><br>I. Any federally insured depository institution or any federally insured credit union;<br><br>II. Any Farm Credit System institution (other than the Federal Agricultural Mortgage Corporation) as defined in 12 U.S.C. 2002(a) that applies the requirements under the Bank Secrecy Act and its implementing regulations (collectively, BSA) as a federally regulated financial institution, or functionally equivalent requirements that are not altered by this rule; and<br><br>III. Any depository or non-depository financing provider that originates, maintains, and services business loans or other commercial financial receivables and participation interests; has a formalized compliance program; applies the requirements under the BSA as a federally regulated financial institution, or the BSA requirements of an equivalent federally regulated financial institution; has been operating since at least February 15, 2019, and has originated, maintained, and serviced more than $50 million in business loans or other commercial financial receivables during a consecutive 12 month period in the past 36 months, or is a service provider to any insured depository institution that has a | FAQ 22: I am a non-bank lender that meets all applicable criteria of the PPP Interim Final Rule. Will I be automatically enrolled as a PPP lender? What criteria will SBA and the Treasury Department use to assess whether to approve my application to participate as a PPP lender?<br><br>Answer: We encourage lenders that are not currently 7(a) lenders to apply in order to increase the scope of PPP lending options and the speed with which PPP loans can be disbursed to help small businesses across America. We recognize that financial technology solutions can promote efficiency and financial inclusion in implementing the PPP. Applicants should submit SBA Form 3507 and the relevant attachments to NFRLApplicationForPPP@sba.gov. Submission of the SBA Form 3507 does not result in automatic enrollment in the PPP, SBA, and the Treasury Department will evaluate each application from a non-bank or non-insured depository institution lender and determine whether the applicant has the necessary qualifications to process, close, disburse, and service PPP loans made with SBA's guarantee. SBA may request additional information from the applicant before making a determination. |

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| *(Continued from previous page)* | contract to support such institution's lending activities in accordance with 12 U.S.C. 1867(c) and is in good standing with the appropriate Federal banking agency. | *(Continued from previous page)* |

23

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(F)(iv) REFINANCE.—A loan made under subsection (b)(2) during the period beginning on January 31, 2020 and ending on the date on which covered loans are made available may be refinanced as part of a covered loan. | IFR1 Section III(2)(r)vii. Refinancing an SBA EIDL loan made between January 31, 2020 and April 3, 2020. If you received an SBA EIDL loan from January 31, 2020 through April 3, 2020, you can apply for a PPP loan. If your EIDL loan was not used for payroll costs, it does not affect your eligibility for a PPP loan. If your EIDL loan was used for payroll costs, your PPP loan must be used to refinance your EIDL loan. Proceeds from any advance up to $10,000 on the EIDL loan will be deducted from the loan forgiveness amount on the PPP loan. | We did not identify any FAQ that related directly to this requirement. |

24

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(F)(v) NONRECOURSE.— Notwithstanding the waiver of the personal guarantee requirement or collateral under subparagraph (J), the Administrator shall have no recourse against any individual shareholder, member, or partner of an eligible recipient of a covered loan for nonpayment of any covered loan, except to the extent that such shareholder, member, or partner uses the covered loan proceeds for a purpose not authorized under clause (I). | IFR1 Section III(2)s. What happens if PPP loan funds are misused?

If you use PPP funds for unauthorized purposes, SBA will direct you to repay those amounts. If you knowingly use the funds for unauthorized purposes, you will be subject to additional liability such as charges for fraud. If one of your shareholders, members, or partners uses PPP funds for unauthorized purposes, SBA will have recourse against the shareholder, member, or partner for the unauthorized use. | We did not identify any FAQ that related directly to this requirement. |

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(G) BORROWER REQUIREMENTS.—<br><br>"(i) CERTIFICATION.—An eligible recipient applying for a covered loan shall make a good faith certification—<br><br>"(I) that the uncertainty of current economic conditions makes necessary the loan request to support the ongoing operations of the eligible recipient;<br><br>"(II) acknowledging that funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments;<br><br>"(III) that the eligible recipient does not have an application pending for a loan under this subsection for the same purpose and duplicative of amounts applied for or received under a covered loan; and<br><br>"(IV) during the period beginning on February 15, 2020 and ending on December 31, 2020, that the eligible recipient has not received amounts under this subsection for the same purpose and duplicative of amounts applied for or received under a covered loan. | IFR1 Section III(2)t. What certifications need to be made?<br><br>On the Paycheck Protection Program application, an authorized representative of the applicant must certify in good faith to all of the below:<br><br>i. The applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099–MISC.<br><br>ii. Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.<br><br>iii. The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments; I understand that if the funds are knowingly used for unauthorized purposes, the Federal Government may hold me legally liable such as for charges of fraud. As explained above, not more than 25 percent of loan proceeds may be used for non-payroll costs.<br><br>vi. During the period beginning on February 15, 2020 and ending on December 31, 2020, the applicant has not and will not receive another loan under this program.<br><br>Note: For brevity, we excluded certifications iv, v, vii, and viii from the Interim Final Rule. | FAQ 31: Do businesses owned by large companies with adequate sources of liquidity to support the business's ongoing operations qualify for a PPP loan?<br><br>Answer: In addition to reviewing applicable affiliation rules to determine eligibility, all borrowers must assess their economic need for a PPP loan under the standard established by the CARES Act and the PPP regulations at the time of the loan application. Although the CARES Act suspends the ordinary requirement that borrowers must be unable to obtain credit elsewhere (as defined in section 3(h) of the Small Business Act), borrowers still must certify in good faith that their PPP loan request is necessary. Specifically, before submitting a PPP application, all borrowers should review carefully the required certification that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Borrowers must make this certification in good faith, taking into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business.<br><br>Note: For brevity, we limited the text above to sections of the answer to FAQ 31 related to this topic. |

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(H) FEE WAIVER. —During the covered period, with respect to a covered loan—<br><br>"(i) in lieu of the fee otherwise applicable under paragraph (23)(A), the Administrator shall collect no fee; and<br><br>"(ii) in lieu of the fee otherwise applicable under paragraph (18)(A), the Administrator shall collect no fee. | IFR1 Section III(4)b. Are there any fee waivers?<br><br>i. There will be no up-front guarantee fee payable to SBA by the Borrower;<br>ii. There will be no lender's annual service fee ("on-going guaranty fee") payable to SBA;<br>iii. There will be no subsidy recoupment fee; and<br>iv. There will be no fee payable to SBA for any guarantee sold into the secondary market. | We did not identify any FAQ that related directly to this requirement. |
| Section 1102(a)(2)(I) CREDIT ELSEWHERE. — During the covered period, the requirement that a small business concern is unable to obtain credit elsewhere, as defined in section 3(h), shall not apply to a covered loan. | Section III(3)e. Do lenders have to apply the "credit elsewhere test"?<br><br>No. When evaluating an applicant's eligibility lenders will not be required to apply the "credit elsewhere test" (as set forth in section 7(a)(1)(A) of the Small Business Act (15 U.S.C. 636) and SBA regulations at 13 CFR 120.101)). | FAQ 31: Do businesses owned by large companies with adequate sources of liquidity to support the business's ongoing operations qualify for a PPP loan?<br><br>Answer: Although the CARES Act suspends the ordinary requirement that borrowers must be unable to obtain credit elsewhere (as defined in section 3(h) of the Small Business Act), borrowers still must certify in good faith that their PPP loan request is necessary.<br><br>Note: For of brevity, we limited the text above to sections of the answer to FAQ 31 related to this topic. |

27

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(J) WAIVER OF PERSONAL GUARANTEE REQUIREMENT.— During the covered period, with respect to a covered loan— "(I) no personal guarantee shall be required for the covered loan; and "(II) no collateral shall be required for the covered loan. | IFR1 Section III(4)a. What are the loan terms and conditions?

Loans will be guaranteed under the PPP under the same terms, conditions and processes as other 7(a) loans, with certain changes including but not limited to:
i. The guarantee percentage is 100 percent.
ii. No collateral will be required.
iii. No personal guarantees will be required.
iv. The interest rate will be 100 basis points or one percent.
v. All loans will be processed by all lenders under delegated authority and lenders will be permitted to rely on certifications of the borrower in order to determine eligibility of the borrower and the use of loan proceeds. | We did not identify any FAQ that related directly to this requirement. |

28

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(K) MATURITY FOR LOANS WITH REMAINING BALANCE AFTER APPLICATION OF FORGIVENESS.—With respect to a covered loan that has a remaining balance after reduction based on the loan forgiveness amount under section 1106 of the CARES Act—<br><br>"(i) the remaining balance shall continue to be guaranteed by the Administration under this subsection; and<br><br>"(ii) the covered loan shall have a maximum maturity of 10 years from the date on which the borrower applies for loan forgiveness under that section. | IFR1 Section III(2)j. What will be the maturity date on a PPP loan?<br><br>The maturity is two years. While the Act provides that a loan will have a maximum maturity of up to ten years from the date the borrower applies for loan forgiveness (described below), the Administrator, in consultation with the Secretary, determined that a two year loan term is sufficient in light of the temporary economic dislocations caused by the coronavirus. Specifically, the considerable economic disruption caused by the coronavirus is expected to abate well before the two year maturity date such that borrowers will be able to re-commence business operations and pay off any outstanding balances on their PPP loans. | IFR1 Section III(2)j. What will be the maturity date We did not identify any FAQ that related directly to this requirement. |

29

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(L) INTEREST RATE REQUIREMENTS.—A covered loan shall bear an interest rate not to exceed 4 percent. | IFR1 Section III(2)i. What is the interest rate on a PPP loan?<br><br>The interest rate will be 100 basis points or one percent.<br><br>The Administrator, in consultation with the Secretary, determined that a one percent interest rate is appropriate. First, it provides low cost funds to borrowers to meet eligible payroll costs and other eligible expenses during this temporary period of economic dislocation caused by the coronavirus. Second, for lenders, the 100 basis points offers an attractive interest rate relative to the cost of funding for comparable maturities. For example, the FDIC's weekly national average rate for a 24-month CD deposit product for the week of March 30, 2020 is 42 basis points for non-jumbo and 44 basis points for jumbo (https://www.fdic.gov/regulations/resources/rates/). Third, the interest rate is higher than the yield on Treasury securities of comparable maturity. For example, the yield on the Treasury two-year note is approximately 23 basis points. This higher yield combined with the fact that the loans are 100 percent guaranteed by the SBA and the fact that lenders will receive a substantial processing fee from the SBA provide ample inducement for lenders to participate in the PPP. | We did not identify any FAQ that related directly to this requirement. |

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(M) LOAN DEFERMENT.— <br><br> "(i) DEFINITION OF IMPACTED BORROWER.— <br><br> "(I) IN GENERAL.—In this subparagraph, the term 'impacted borrower' means an eligible recipient that— <br><br> "(aa) is in operation on February 15, 2020; and <br><br> "(bb) has an application for a covered loan that is approved or pending approval on or after the date of enactment of this paragraph. <br><br> "(II) PRESUMPTION.—For purposes of this subparagraph, an impacted borrower is presumed to have been adversely impacted by COVID-19. <br><br> "(ii) DEFERRAL.—During the covered period, the Administrator shall— <br><br> "(I) consider each eligible recipient that applies for a covered loan to be an impacted borrower; and <br><br> "(II) require lenders under this subsection to provide complete payment deferment relief for impacted borrowers with covered loans for a period of not less than 6 months, including payment of principal, interest, and fees, and not more than 1 year. | IFR1 Section III(2)n. When will I have to begin paying principal and interest on my PPP loan? <br><br> You will not have to make any payments for six months following the date of disbursement of the loan. However, interest will continue to accrue on PPP loans during this six-month deferment. The Act authorizes the Administrator to defer loan payments for up to one year. The Administrator determined, in consultation with the Secretary, that a six-month deferment period is appropriate in light of the modest interest rate (one percent) on PPP loans and the loan forgiveness provisions contained in the Act. | We did not identify any FAQ that related directly to this requirement. |

31

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(M)(iii) SECONDARY MARKET.—During the covered period, with respect to a covered loan that is sold on the secondary market, if an investor declines to approve a deferral requested by a lender under clause (ii), the Administrator shall exercise the authority to purchase the loan so that the impacted borrower may receive a deferral for a period of not less than 6 months, including payment of principal, interest, and fees, and not more than 1 year. | We did not identify any requirements in the Interim Final Rules issued to date that related directly to this requirement. | We did not identify any FAQ that related directly to this requirement. |
| Section 1102(a)(2)(M)(iv) GUIDANCE.—Not later than 30 days after the date of enactment of this paragraph, the Administrator shall provide guidance to lenders under this paragraph on the deferment process described in this subparagraph. | We did not identify any requirements in the Interim Final Rules issued to date that related directly to this requirement. | We did not identify any FAQ that related directly to this requirement. |

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(N) SECONDARY MARKET SALES.—A covered loan shall be eligible to be sold in the secondary market consistent with this subsection. The Administrator may not collect any fee for any guarantee sold into the secondary market under this subparagraph. | IFR1 Section III(4)b. Are there any fee waivers? <br><br> iv. There will be no fee payable to SBA for any guarantee sold into the secondary market. <br><br> IFR1 Section III(4)d. Can PPP loans be sold into the secondary market? <br><br> Yes. A PPP loan may be sold on the secondary market after the loan is fully disbursed. A PPP loan may be sold on the secondary market at a premium or a discount to par value. SBA will issue guidance regarding any advance purchase for loans sold in the secondary market. | FAQ 30: Can a lender sell a PPP loan into the secondary market? <br><br> Answer: Yes. A PPP loan may be sold into the secondary market at any time after the loan is fully disbursed. A secondary market sale of a PPP loan does not require SBA approval. A PPP loan sold into the secondary market is 100% SBA guaranteed. A PPP loan may be sold on the secondary market at a premium or a discount to par value. |

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(O) REGULATORY CAPITAL REQUIREMENTS.— "(i) RISK WEIGHT.—With respect to the appropriate Federal banking agencies or the National Credit Union Administration Board applying capital requirements under their respective risk-based capital requirements, a covered loan shall receive a risk weight of zero percent. "(ii) TEMPORARY RELIEF FROM TDR DISCLOSURES.—Notwithstanding any other provision of law, an insured depository institution or an insured credit union that modifies a covered loan in relation to COVID-19-related difficulties in a troubled debt restructuring on or after March 13, 2020, shall not be required to comply with the Financial Accounting Standards Board Accounting Standards Codification Subtopic 310–40 ('Receivables – Troubled Debt Restructurings by Creditors') for purposes of compliance with the requirements of the Federal Deposit Insurance Act (12 U.S.C. 1811 et seq.), until such time and under such circumstances as the appropriate Federal banking agency or the National Credit Union Administration Board, as applicable, determines appropriate. | We did not identify any requirements in the Interim Final Rules issued to date that related directly to this requirement. | We did not identify any FAQ that related directly to this requirement. |

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(P) REIMBURSEMENT FOR PROCESSING.— | IFR1 Section III(3)d. What fees will lenders be paid? | We did not identify any FAQ that related directly to this requirement. |
| "(i) IN GENERAL.—The Administrator shall reimburse a lender authorized to make a covered SBA loan at a rate, based on the balance of the financing outstanding at the time of disbursement of the covered loan, of— | in the following amounts: | |
| "(I) 5 percent for loans of not more than $350,000; | i. Five (5) percent for loans of not more than $350,000; | |
| "(II) 3 percent for loans of more than $350,000 and less than $2,000,000; and | ii. Three (3) percent for loans of more than $350,000 and less than $2,000,000; and | |
| "(III) 1 percent for loans of not less than $2,000,000. | iii. One (1) percent for loans of at least $2,000,000. | |
| "(ii) FEE LIMITS.—An agent that assists an eligible recipient to prepare an application for a covered loan may not collect a fee in excess of the limits established by the Administrator. | IFR1 Section III(4)c. Who pays the fee to an agent who assists a borrower? | |
| "(iii) TIMING.—A reimbursement described in clause (i) shall be made not later than 5 days after the disbursement of the covered loan. | Agent fees will be paid by the lender out of the fees the lender receives from SBA. Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed: | |
| | i. One (1) percent for loans of not more than $350,000; | |
| | ii. 0.50 percent for loans of more than $350,000 and less than $2 million; and | |
| | iii. 0.25 percent for loans of at least $2 million. | |
| | The Act authorizes the Administrator to establish limits on agent fees. The Administrator, in consultation with the Secretary, determined that the agent fee limits set forth above are reasonable | |

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| *(Continued from previous page)* | based upon the application requirements and the fees that lenders receive for making PPP loans. | *(Continued from previous page)* |

36

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(P)(iv) SENSE OF THE SENATE.—It is the sense of the Senate that the Administrator should issue guidance to lenders and agents to ensure that the processing and disbursement of covered loans prioritizes small business concerns and entities in underserved and rural markets, including veterans and members of the military community, small business concerns owned and controlled by socially and economically disadvantaged individuals (as defined in section 8(d)(3)(C)), women, and businesses in operation for less than 2 years.<br><br>Note: This citation is the same as 637(d)(3)(C). | IFR1 Section III(2)m. Is the PPP "first-come, first-served?"<br><br>Yes. | We did not identify any FAQ that related directly to this requirement. |

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(a)(2)(Q) DUPLICATION.—Nothing in IFR1 Section III(2)(f)vii. How can PPP loans be used? | We did not identify any FAQ that related directly to this requirement. |
| Section 1102(a)(2)(R) WAIVER OF PREPAYMENT PENALTY.—Notwithstanding any other provision of law, there shall be no prepayment penalty for any payment made on a covered loan.". | Refinancing an SBA EIDL loan made between January 31, 2020 and April 3, 2020. If you received an SBA EIDL loan from January 31, 2020 through April 3, 2020, you can apply for a PPP loan. If your EIDL loan was not used for payroll costs, it does not affect your eligibility for a PPP loan. If your EIDL loan was used for payroll costs, your PPP loan must be used to refinance your EIDL loan. | |

38

| CARES Act Requirement | Interim Final Rule | Related Frequently Asked Questions |
|---|---|---|
| Section 1102(b) COMMITMENTS FOR 7(A) LOANS.—During the period beginning on February 15, 2020 and ending on June 30, 2020— (1) the amount authorized for commitments for general business loans authorized under section 7(a) of the Small Business Act (15 U.S.C. 636(a)), including loans made under paragraph (36) of such section, as added by subsection (a), shall be $349,000,000,000; and | IFR1 Section III.(1) General- SBA is authorized to guarantee loans under the PPP through June 30, 2020. Congress authorized a program level of $349,000,000,000 to provide guaranteed loans under this new 7(a) program. | We did not identify any FAQ that related directly to this requirement. |



**BANK OF AMERICA** 

PO Box 982443
El Paso, TX 79998-2443



BR        1     465 090 000852 #@01 AB 0.419

**Application Number**
4106946274

SALTWATER FILMS & NETWORKS LLC
ATTN: LAUREN ALEXON BODEN
1357 S ORANGE DR
LOS ANGELES CA 90019-2903

**Date**
May 20, 2020

Saltwater Films & Networks Llc

# Your Paycheck Protection Program loan application has been canceled.

Thank you for submitting your loan application to the federal Paycheck Protection Program through Bank of America.

Your loan application was carefully reviewed and was declined for the following reason:

You don't meet the Small Business Administration's Paycheck Protection Program eligibility requirements based on the responses you provided on your application.

Therefore, your loan application number 4106946274 has been canceled.

Please visit the U.S. Treasury's page on Assistance for Small Businesses at https://home.treasury.gov/policy-issues/top-priorities/cares-act/assistance-for-small-businesses for additional resources and information.

For questions related to the federal Paycheck Protection Program, please contact us at PPP_Help@bofa.com. Keep in mind, email isn't a secure method for sending information, so it's important not to include sensitive information like account or Social Security numbers in any emails you send us.

Given the nature of this federal loan process with the SBA, information about your application will not be available through Bank of America financial centers or contact centers.

We thank you for being our client. More information about our efforts to help address impacts of the COVID-19 situation are available at bankofamerica.com.

## EQUAL CREDIT OPPORTUNITY ACT NOTICE
The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning Bank of America, N.A., 100 N. Tryon Street, Charlotte, NC 28255, is the Bureau of Consumer Financial Protection, 1700 G Street NW, Washington, DC 20006.

 Gmail        Saltwater Films <pr@saltwaternetworks.com>

## PayPal Paycheck Protection Program Loan Request
1 message

**LoanBuilder** <noreply@loanbuilder.com>      Thu, May 28, 2020 at 4:52 PM
To: "pr@saltwaternetworks.com" <pr@saltwaternetworks.com>

SBA Paycheck Protection Program Loan, brought to you by 

Lauren Boden
Saltwater Films & Networks
5455 Wilshire Blvd
Los Angeles, CA 90019
Thank you for your recent Paycheck Protection Program loan request. We regret to inform you that after careful
consideration, we were unable to approve your request at this time for the following reason(s):

Did not supply sufficient payroll information

Our credit decision was based in whole or in part on information obtained in a report from the consumer reporting
agency listed below. You have a right under the Fair Credit Reporting Act to know the information contained in your
credit file at the consumer reporting agency. The reporting agency played no part in our decision and is unable to supply
specific reasons why we have denied credit to you. You also have a right to a free copy of your report from the reporting
agency, if you request it no later than 60 days after you receive this notice. In addition, if you find that any information
contained in the report you receive is inaccurate or incomplete, you have the right to dispute the matter with the
reporting agency.

TRANSUNION
2 Baldwin Place, PO Box 1000
Chester, PA 19022
(800) 888-4213
WWW.TRANSUNION.COM

We also obtained your credit score from the consumer reporting agency and used it in making our credit decision. Your
credit score is a number that reflects the information in your credit report. Your credit score can change, depending on
how the information in your credit report changes.

Your credit score: 591

Date: 5/27/2020

Scores range from a low of 300 to a high of 850.

Key factors that adversely affected your credit score:

Serious personal delinquency, and public record or collection filed
Proportion of balances to credit limits on bank/national or other revolving personal accounts is too high
Time since personal derogatory public record or collection is too short
Proportion of personal loan balances to loan amounts is too high
The number of inquiries in the last 12 months adversely affected your score.

Our credit decision was also based, in whole or in part, on information obtained in a report from the business credit
reporting agency listed below. The reporting agency played no part in our decision and is unable to supply specific
reasons why we have denied credit to you. You also have the ability to request a free copy of your business credit report
from the reporting agency, if you request it no later than 60 days after you receive this notice. To request a copy, you
must forward a copy of this notification to the mailing or email address listed below. In addition, if you find that any

Case 2:20-cv-04973-ODW-JEM Document 5 Filed 07/08/20 Page 90 of 91 Page ID #:190

information contained in the report you receive is inaccurate or incomplete, you can dispute the matter with the reporting agency.

Experian Commercial Relations - RFR
P.O. Box 5001
Costa Mesa, CA 92628-5001
Email: RFR@experian.com

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is:

FDIC - Consumer Response Center
1100 Walnut St, Box #11
Kansas City, MO 64106

Sincerely,
PayPal Paycheck Protection Program loan Underwriting Team
On Behalf of WebBank, Salt Lake City, Utah

3505 Silverside Rd., Suite 200, Wilmington, DE 19810



U.S. POSTAGE PAID
Priority Mail
1 Day
LOS ANGELES, CA
90035
MAY 30, 20
AMOUNT
$8.25
R2305K132284-22

90012
1004

TO:

Clerk of Court

255 E. Temple Street, Suite TS-134, Los Angeles, CA 90012-3332.

EXPECTED DELIVERY DAY: 06/01/20

USPS TRACKING® NUMBER



9505 5128 5763 0151 5286 64

FROM:

B. 310-802-9777

E. pr@saltwaternetworks.com

www.saltwaternetworks.com

5455 Wilshire Blvd.
21st floor
Los Angeles, CA, US, 90036

SALTWATER FILMS & NETWORKS



PRIORITY MAIL

TRACKED
INSURED

UNITED STATES
POSTAL SERVICE®

For Domestic and International Use

Label 107R, May 2014